**UNIVERSAL LIFE CHURCH, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 583–84T.

United States Claims Court.

Nov. 10, 1987.

Peter R. Stromer, Los Gatos, Cal., for plaintiff.

David Gustafson, Washington, D.C., with whom were W.C. Rapp, Gerald B. Leedom, Mildred L. Seidman, and Acting Asst. Atty. Gen. William S. Rose, Jr., for defendant.

## OPINION

NETTESHEIM, Judge.

This case comes before the court on defendant's motion for summary judgment, which was renewed on the basis that plaintiff no longer qualifies as an exempt organization because it has not been operated exclusively for exempt purposes. Plaintiff opposed, taking the position that there are genuine issues of material fact. The parties have been heard. The question to be resolved is whether plaintiff is being operated for a substantial nonexempt purpose by dint of supplying tax advice and tax-related information to its congregations, coupled with allowing its congregations to engage in nonexempt activities.

## FACTS

This suit arises out of a letter ruling issued by the Internal Revenue Service (the "IRS") on August 28, 1984, revoking its prior ruling of April 13, 1976, which recognized the tax status of Universal Life Church, Inc. ("plaintiff" or "ULC"), as an exempt organization under section 501(c)(3) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(c)(3) (1982) (the "I.R.C."). I.R.C. § 501(c)(3) allows an exemption from federal income taxes for a corporation organized and operated exclusively for religious purposes if no part of its net earnings inures to the benefit of a private individual. *See* Treas.Reg. § 1.501(c)(3)–1 (1981). Under the authority of I.R.C. § 7428(a)(1)(A), and 28 U.S.C. § 1507 (1982), plaintiff sued in this court for a declaration that plaintiff is an exempt organization under I.R.C. § 501(c)(3).

The letter of revocation was effective May 1, 1977, for the fiscal years ending April 30, 1978, through April 30, 1981. The IRS based its decision on five grounds: 1) that plaintiff's net earnings have inured to individuals; 2) that activities of plaintiff have benefitted privately its founder and other members of plaintiff's charter congregations; 3) that plaintiff had not been operated exclusively for the purposes set forth in I.R.C. § 501(c)(3); 4) that plaintiff has engaged in the nonexempt purpose of providing tax advice to individuals; and, finally, 5) that through its tax advice and related activities plaintiff has furthered the private interests of its members. *See Universal Life Church, Inc. v. United States*, 9 Cl.Ct. 614, 615 (1986) (order denying motion for summary judgment). Judge Miller denied summary judgment on the ground of individual inurement. The case was transferred to this court due to the untimely illness of Judge Miller after plaintiff had moved for relief from an earlier preclusive order. That order was modified in part; plaintiff was allowed to respond to out-

standing discovery requests; and defendant renewed its motion on another of the five grounds relied upon by the IRS to revoke plaintiff's exempt status.

 The following facts derive, for the most part, from plaintiff's responses to defendant's discovery requests.[1] Defendant set forth the documents and answers to interrogatories provided by plaintiff and drew its factual assertions from this discovery. In short, defendant displayed on the record the discovery product that it had obtained from plaintiff and challenged plaintiff to show that its statements of uncontested material facts, cited to these documents and responses, were irrelevant, inaccurate, or unsupported. The facts recited are agreed on or are matters that plaintiff chose not to dispute; matters that plaintiff was barred from disputing by an order precluding plaintiff from relying on certain matter not disclosed in discovery and by another order striking certain of plaintiff's responses to defendant's statement of facts and portions of its declarations; or matters that plaintiff failed to support with evidence as required by RUSCC 56(d)(2), (f).[2] Discussion of activities by plaintiff prior to the suit years is not relied on for this decision. The references are used only to illustrate continuing practices of plaintiff and the background against which suit year activities took place.

### 1. *Publication of tax advice*

Plaintiff is a religious organization, incorporated in 1962, with headquarters in Modesto, California, that ordains ministers, charters congregations, and conducts meetings. It was recognized as a church and religious denomination in *Universal Life Church, Inc. v. United States,* 372 F.Supp. 770 (E.D.Cal.1974). Plaintiff submits that

---

1. In revocation proceedings before this court under I.R.C. § 7428, the parties may supplement the administrative record. *See Animal Protection Inst., Inc. v. United States,* 42 A.F.T.R. 78–5855 (Cl.Ct. Trial Div. 1978); *cf. Church of The Visible Intelligence That Governs The Universe v. United States,* 4 Cl.Ct. 55, 60 (1983) (determination of organization's initial qualification as tax exempt is limited to administrative record).

2. Plaintiff takes the position that it cannot be cited for failing to make discovery when it provided over 2,000 pages of documents and that it responded to four requests for production, seven sets of interrogatories, and three sets of requests for admissions. Initially, it should be pointed out that defendant's discovery has pursued two independent legal theories at two different intervals, since Judge Miller suggested after defendant's first motion for summary judgment was denied that defendant might want to renew on another ground. *See* 9 Cl.Ct. at 618. In this context defendant's discovery requests are not as voluminous as plaintiff depicts.

Defendant moved on September 4, 1986, to compel production of documents and other information after having notified plaintiff of the specific items as to which defendant believed plaintiff's production was incomplete. The Chief Judge, acting in Judge Miller's absence, granted the unopposed motion on September 24, 1986, and entered a preclusive order pursuant to RUSCC 37(b)(2)(B) that would prevent plaintiff from relying on documents not produced or information not supplied. Plaintiff on October 6, 1986, moved out of time for reconsideration or for a protective order. By order of November 10, 1986, this court granted plaintiff's motion insofar as ordering that the preclusive order be revised to limit further production to the years in suit and to restrict access to information identifying names. On November 21, 1986, the preclusive order entered, as modified, allowing plaintiff to comply by December 31, 1986, or be subject to the provisions of the order precluding later reliance on specific types of documents or information not made available to defendant.

The motion to strike was granted on October 2, 1987, after plaintiff failed to respond to defendant's September 14, 1987 motion listing paragraphs of plaintiff's declarations and numbered statements of genuine issues, *i.e.,* plaintiff's factual assertions in response to defendant's proposed findings. The basis for defendant's motion to strike was that the material was not supported by evidence, as required by RUSCC 56(d)(2), (f), or that the preclusive order of November 21, 1986 barred reliance on the material sought to be stricken. On October 7, 1987, during argument, plaintiff stated that it would seek reconsideration of the October 2 order. As plaintiff had no excuse for its failure to respond to the motion to strike, the court announced that any such motion would be denied summarily.

Although defendant was entitled to prevail on its motion to strike for those items subject to the preclusive order, the court views its function on summary judgment as evaluating independently whether the opponent's responses satisfy RUSCC 56(d)(2), (f). Plaintiff's factual assertions and declarations have been scrutinized accordingly.

its doctrine is a restatement of the Golden Rule to do that which is right. However, plaintiff does not define what is right to its followers. Rev. Kirby J. Hensley testified in a 1982 tax case that every individual "has the right to interpret what's right for them." Plaintiff described its philosophy in its Spring 1978 Universal Life [hereinafter "Newsletter"]:

THE UNIVERSAL LIFE CHURCH, INC. HAS NO TRADITIONAL DOCTRINE. WE ONLY BELIEVE IN THAT WHICH IS RIGHT. EACH INDIVIDUAL HAS THE PRIVILEGE AND RESPONSIBILITY TO DETERMINE WHAT IS RIGHT FOR HIM/HER AS LONG AS IT DOES NOT INFRINGE ON THE RIGHTS OF OTHERS. WE DO NOT STAND BETWEEN YOU AND YOUR GOD. WE ARE ACTIVE ADVOCATES OF THE FIRST AMENDMENT OF THE UNITED STATES OF AMERICA.

(Emphasis in original.) As part of this religious philosophy, plaintiff teaches that anyone is entitled to be ordained and to start a church congregation—without question as to his religious beliefs—and that a minister so ordained and a church so started are entitled to every benefit, courtesy, and respect afforded to the ministers and congregations of traditional churches. Plaintiff ordains ministers and charters congregations consistent with this teaching.

Since 1973 plaintiff has chartered congregations for fees ranging from $5.00 to $35.00. Plaintiff provides ministerial certificates for a free-will offering. Plaintiff offered a range of materials and titles for a fee, as well as courses bestowing honorary degrees and licenses for minimum offerings ranging from $10.00 to $100.00. Plaintiff allowed any of its ministers to ordain others requesting only that the names and addresses of the newly ordained be sent to headquarters.

Plaintiff described the duties of ministers in its 1980 Book, *The Universal Life Church* [hereinafter the *"ULC Book"*], repeated in the 1984 edition, *A Textbook About The Universal Life Church* [hereinafter the *"ULC Textbook"*], which states:

The minister is by definition a servant. The minister exists to serve himself, his congregation, the church, and his God. He is an agent administrating the duties and functions of his church.

The minister should be compassionate, loving, and trustworthy. The responsibility of church administration rests on his shoulders. The minister must be able to weep with those that weep and rejoice with those rejoicing. He should strive to be an able leader, to promote spiritual growth and happiness within the congregation.

Every minister needs to have some knowledge of the legal rules and principles concerning the relationship of church and state in the United States. This understanding and application of the rules and principles will greatly help to serve, with commendable distinction, the parishioners and community.

Plaintiff does not seek to control the actions of its ministers, as illustrated in its 1987 pamphlet, The Kingdom of God "Now": "You must be recognized, at all times, that you have been made a Reverend AND a King, and that you are doing that which is right—not necessarily what the ULC says is right, but what YOU believe to be what is right." (Emphasis in original.) Plaintiff did not require any formal church meetings. There was no particular format for church services. Anything that brought happiness to people and did not hurt anyone could be a religious service or experience. In answer to a question from a reader on how often churches must meet, plaintiff pointed to the fact that churches generally meet on a weekly basis, but espoused the view that church services should be spaced "as to be reasonable for the religious purposes of the [individual] church."

Plaintiff communicated with its congregations by means of its newsletters and other publications, telephonically, and by mail. In addition, plaintiff conveyed its message at church meetings, seminars, and conventions. However, plaintiff's newslet-

ters were the primary means of communication, and plaintiff informed its ministers that the newsletters were to be looked at as important communications. In its June 1986 Newsletter, Rev. Hensley made the statement: "We have such a large number of people to correspond with that the best way we have found to do so is through this little magazine.... Really, the only time many of you hear from us is when you receive the magazine...." The Universal Life Church Agreement, published in plaintiff's September 1986 Newsletter, directs ministers to study plaintiff's literature:

> The Agreement is entered into by the Universal Life Church, International Headquarters, and three ministers (whose signatures appear below) of legal age. Responsibilities and advantages of the local church, too numerous to detail in this Agreement, are discussed in the many publications of the Universal Life Church. It is the responsibility of the governing body of the local church to study that literature. The local church will become active once this Agreement is received and properly recorded at International Headquarters. It will remain active only as long as the points of the Agreement are kept. The Universal Life Church International Board of Directors reserves the right to cancel this Agreement if any of the conditions of this Agreement are not kept.

Plaintiff's newsletters were printed in quantities of 100,000 per issue. In its January 1971 Newsletter, plaintiff estimated that it had sent out 700,000 ministerial certificates. In its Winter 1978 Newsletter, plaintiff speculated that its number of 6.5 million ministers would grow to 13 million if each minister would ordain just one other.[3] There is a great disparity in the number of newsletters printed in relationship to the number of ministers ordained. In its Summer and Winter 1977 Newsletters, plaintiff stated that it would only distribute its newsletters to paid subscribers.

Plaintiff's Fall 1980 Newsletter stated:

### WE NEED YOU!

> Would you like to really work for the Universal Life Church and make real good money? Here is the way to do it! Starting November 16th and ending with the convention on the 22nd of 1980, we have a series of seminars to instruct you how to go forth into all parts of the country to organize and establish congregations for the Universal Life Church.

(Emphasis in original.)

In an article entitled "Today's News" from plaintiff's Spring 1984 Newsletter, the following excerpt appeared: "One of the reasons we would like you to attend these meetings is so we can show you how to have a better life now, how to earn money, have a better car, have a better home and a better life...."

Plaintiff attempted to provide information to its congregations through other publications. Plaintiff published a pamphlet entitled Charter Information in 1977; the *ULC Book* in 1980; How to Start a Congregation in 1983; the *ULC Textbook* in 1984; *The Buffer Zone* in 1986, plus various other pamphlets. Plaintiff printed 30,000 of its textbooks, but does not know how many of its congregations received them during the years at suit. The textbooks usually sold for $5.00 each. In 1985 some of the textbooks were distributed free.

*The Buffer Zone,* which was a compilation of reprinted magazine and newspaper articles, as well as material from textbooks, included the following statement of Rev. Hensley:

> "I'm the most powerfulest man in America today. I believe that myself because of my religious ideals. I believe I'm far advanced to anyone else.

> Now that's the spiritual side, but the other side is I'm handling more people's money. That's where the control is.... If I gave you $500 a week and I said

---

**3.** The number of congregations readily cannot be identified. The estimate of active congregations that filed quarterly reports ranges from 10,000 to 70,000. However, plaintiff has never claimed that it only attempted to reach its congregations with its newsletters, but identified the newsletters as the "only practical means of communicating with our ministers."

Reagan is the fellow we need you'd think twice before you voted for one of the other guys, wouldn't you?"

Plaintiff also attempted to reach its membership through seminars. The seminars involved procedures for conducting church affairs, including financial information. One such seminar, entitled "Taxes and the ULC," was a promotional tape from the 1980 "World Convention." The speech taken from this convention was advertised in plaintiff's Spring 1980 Newsletter. The advertisement included a request for subscription to the film project by ULC ministers and churches. Although plaintiff may not have sponsored the documentary project, it certainly endorsed it by its inclusion in the newsletter. The advertisement included the following passages:

BE A PART OF THE STORY THAT MUST BE TOLD!

To complete financing of this production, ULC ministers and churches may take advantage of our *exclusive* subscription units at $1,000 each. As you know, financial participation by ULC churches is considered *passive investment* and all returns are *tax-exempt.* Peter R. Stromer, ULC attorney, has prepared necessary Subscription Agreements; Clifford A. Cox, an independent Certified Public Accountant ... will handle all documentary Project Monies. The Project telephone number is (805) 927–8888.

SPECIAL DOCUMENTARY PREVIEW FILM

Those interested in financial participation will be able to view A SPECIAL DOCUMENTARY PREVIEW FILM of 20 minutes duration in 16mm color which has been prepared by Alan Neuman Productions for presentation by the Project Staff. This sample film clip demonstrates the quality of both filming and sound for the completed documentary. "TAXES & ULC"—SPECIAL TAPE OFFER

Share the excitement of the World Convention! The Documentary Project Team has prepared two 1–hour tapes especially for you: 1. TAXES & ULC—

features ULC attorney Peter R. Stromer and other speakers, and 2. Bishop Kirby Hensley's stirring address to the 1980 World Convention. Because these tapes are taken from the actual Documentary sound track, they are unsurpassed in quality.

(Emphasis in original.)

Plaintiff maintains that the ULC is a single entity. It began including admonitions to this effect in its newsletters beginning in its 1977 Winter Newsletter:

Now they [the IRS] are harassing our people again saying that the exemption is only for the Modesto Church. We agree that it is for one church. That is all there is JUST ONE UNIVERSAL LIFE CHURCH, INC. and it is as big as the universe. Where ever you are you are Universal Life. We interpret it as a family. When a child is born you give it a name to identify it but still keeps the family name. You can see the governing body, the seal, and the President's signature is the same wherever you go.

(Emphasis in original.) During the suit years, a considerable effort was undertaken to educate congregations that they were part of one church. The advice was directed toward how congregations should deal with the authorities. The following appeared in plaintiff's Spring 1979 Newsletter with the opening set in large bold letters:

NOTICE

TO ALL

MINISTERS

When you are dealing with the IRS, Federal or State governments or local officials always tell them that you belong to the Universal Life Church, Inc. in Modesto. Remember we are all one church. All donations are made to Universal Life Church, Inc. Those of you who give them another name are headed for trouble.

Later plaintiff admonished congregations not to deal with the IRS at all, but to refer all inquiries to headquarters. In its Summer 1979 Newsletter, plaintiff identified

the need to be recognized as one church as a new policy. However, even though plaintiff asserts that it is one church, local congregations had no financial obligations to the International Headquarters in Modesto.

In *Moriarty v. Comm'r*, 48 T.C.M. (CCH) 1345, 1348 (1984), one of plaintiff's church officers, Robert E. Imbeau, testified that local ULC congregations exercised practical autonomy in disbursing funds received by local chapters. However, plaintiff continually reiterated that for legal purposes local congregations must use "Universal Life Church" in identifying themselves as a congregation, not a charter organization. In its Winter 1982 Newsletter, for example, in order to build on the one-church philosophy, plaintiff eliminated the use of the term "charter" in identifying congregations. Plaintiff adjusted its behavior according to circumstances. In November 1983, for the first time, plaintiff required that titles of all real estate and automobiles donated to the church be sent to Modesto. This adjustment in plaintiff's behavior culminated in 1983 with the "Receipts and Disbursements" program. In plaintiff's January 1983 Newsletter, the program was explained:

> You will see in this edition of the paper that we have a far better program than we have ever had before for our people. We have learned a lot in the last twenty years. Our new program [of] receipts and disbursements will help you greatly. If you examine our [receipts] and disbursements program carefully you will learn of its benefits because you know the underlying words of the IRS have been: "Did the money go to the ULC Inc., Modesto CA." With the use of this new program YOU will have proof that the money came to Modesto for the ULC's use. WE KNOW that unless the law is changed ... this new program will work. You will no longer have to answer questions such as "Are you a minister?" or "Did you or do you preach?" You don't have to answer such questions anyway. Let us handle the IRS from International Headquarters if you are using the [receipts] and disbursements program.

Plaintiff explained later in the same newsletter that the program was "necessary to placate the IRS."

However, as of 1985 plaintiff declared its congregations to be sovereign financially and only asked that funds revert to headquarters when a congregation became permanently inactive. The Receipts and Disbursements program was not mandatory, but was only suggested by plaintiff. The disbursement form provided required that congregations identify the payee and the amount requested, but not the purpose of the expenditure. In fact, in plaintiff's November 1983 Newsletter, Rev. Hensley referred to the Receipts and Disbursement program as the "reimbursement program." In addition, plaintiff has presented no evidence that the program was a means to ensure that donated funds requested by the congregations were being used for exempt purposes, other than to state that the program was only to be used for legitimate expenses for individual congregations. Plaintiff was precluded by order of November 21, 1986, entered pursuant to RUSCC 37(b)(2)(B), due to failure to comply with an order compelling answers to certain answer discovery requests, from offering evidence of instances whereby plaintiff disapproved requests for disbursements by its congregations based on their nonexempt nature. Consequently, an order of October 2, 1987, struck from plaintiff's response to defendant's statement of uncontested material facts plaintiff's assertions on this subject, as well as ¶ 16 of the Declaration of Manzanita Hensley Lowarch, July 31, 1987, on point. *See supra* note 2.

During the years in suit, and continuing thereafter, plaintiff's newsletters contained classified advertisements relating expressly to tax avoidance. Plaintiff claims that it did not endorse the ideas and content of the advertisements and that it provided an express disclaimer to that effect: "We do not necessarily agree with all that is written herein. We, the ULC do uphold the individual's right of freedom of expression." The advertisements are offered to show that plaintiff was on notice that its newsletters were being used to promote tax avoidance.

It is unnecessary to find that plaintiff endorsed or agreed with the contents of the newsletters to find such notice.

The advertisements and tax-related articles are significant since plaintiff encouraged its ministers to look to the newsletters for information regarding taxes and the clergy. Plaintiff continuously published articles dealing with taxes and the IRS. The articles included advice by plaintiff and others. Included in plaintiff's newsletters were unattributed articles promoting legislation. For example, plaintiff's July 1984 Newsletter contained the following:

### Battle against IRS taxation

Representative Tom Corcoran (R) from Illinois has introduced a bill to the House of Representatives to provide for a two-year delay in implementation of Social Security taxation of churches and their employees. This allows for both House or Congress to consider this vital issue.

*Recommended action:* Write your US senators and congressmen, supporting the Jepsen Amendment in the Senate and the Corcoran Amendment in the House.

(Emphasis in original.) The newsletters generally included reprinted articles from other publications dealing with taxes, including recitations of the tax benefits to be gained by joining the ULC. Articles promoted the use of the ULC to gain monetary benefit. For example, plaintiff's Spring 1978 Newsletter contained "An Open Letter To Our Readers In Arizona:"

READ THIS LETTER————IT COULD BE WORTH SEVERAL THOUSAND DOLLARS TO YOU THIS YEAR!!! AS A UNIVERSAL LIFE MINISTER YOU CAN GREATLY REDUCE THE AMOUNT YOU ARE NOW PAYING IN TAXES.

WE ARE PROUD TO ANNOUNCE THE FORMATION OF THE ARIZONA ASSOCIATION OF THE UNIVERSAL LIFE CHURCH, BASED IN PHOENIX TO SERVE AS A LOCAL HEADQUARTERS FOR ARIZONA ULC MEMBERS. WE ARE RECOGNIZED AND SPONSORED BY THE ULC MOTHER CHURCH IN MODESTO.

AS A ULC MINISTER YOU HAVE THE RIGHT TO PRACTICE YOUR OWN BELIEFS: BY JOINING THE ULC YOU WILL ALSO REAP ADDITIONAL BENEFITS. YOU MAY DONATE UP TO 50% OF YOUR INCOME *TAX FREE* TO YOUR CHURCH, AND *YOU HAVE COMPLETE CONTROL* OF THESE FUNDS. PARTICIPATING MEMBERS MAY RECEIVE EXACT INSTRUCTIONS AND COMPREHENSIVE AID, BY MAIL OR BY PHONE, ON THE DETAILS OF OPERATING THEIR CHURCH————INFORMATION YOU WILL NOT BE ABLE TO OBTAIN ANYWHERE ELSE. WE KNOW HOW TO DO IT RIGHT AND MAKE IT EASY FOR YOU. [THERE] ARE NO PERSONAL RISKS IN OPERATING YOUR CHURCH PROPERLY. YOU WILL HAVE THE OPPORTUNITY TO MEET AND DISCUSS CHURCH OPERATIONS WITH OTHER MEMBERS OF THE ULC.

THROUGH THE EFFORTS OF THE ULC YOU SHOULD BE ABLE TO OBTAIN YOUR COUNTY PROPERTY TAX EXEMPTION FOR PROPERTY USED FOR RELIGIOUS PURPOSES. YOU MAY HAVE RECENTLY SEEN THE ULC BOARD OF DIRECTORS AND REV. KIRBY HENSLEY CONFRONTING THE MARICOPA COUNTY ASSESSOR KEN KUNES ON TELEVISION CONCERNING THIS PROBLEM.

(Emphasis in original.) Plaintiff may not have approved of this description, but it certainly was aware that tax advice was being provided in its publication. A similar description was included in plaintiff's May 1982 Newsletter. The article was written by a member of plaintiff's Board of Directors, Keith S. Hommedieu. The article included the following excerpt:

Matt.22:21

"Render therefore unto Caesar the things which are [Caesar's], and unto God the things that are God's...."

Any member of the congregation can render up to 50% of their income to the church, and Caesar will allow them to

deduct this amount from their income taxes. The Church can pay the complete housing costs of its pastor including rent, mortgages, insurance, taxes, furnishings, utilities and repairs. The Church can provide the minister with full use of an automobile as well as pay for missionary travel and education expenses. If done for religious purposes, none of these are taxable income to the minister. . . .

Plaintiff cannot deny that this is its own statement. Fed.R.Evid. 801(d)(2)(D). Rev. Hensley himself espoused the monetary benefits of becoming a ULC minister in plaintiff's May 1982 Newsletter:

If you would like to become an ambassador and teach others and make good money at the same time (some of our ministers are making from $30,000 to $200,000 a month) setting up congregations for people, North Carolina, South Carolina and Virginia are ripe fields for this NOW!

(Emphasis in original.)

Plaintiff implored its ministers in its November 1983 Newsletter to perform sacerdotal functions, not as a means to carry out the religious credo, but in order to receive the privileges under I.R.C. § 107. This provision allows an exclusion for a minister from gross income for the rental value of a home furnished, or the rental allowance paid, to a minister. Similarly, plaintiff urged the filing of quarterly reports solely as a means for determining tax-exempt status. The quarterly reports did not inquire into the nature of a congregation's expenditures, but merely how much money was received and disbursed. The procedure is explained in plaintiff's Winter 1980 Newsletter:

A ULC chartered congregation is not required to file any tax return with the State or Federal Government. All pertinent information about your congregation is kept in your congregation's files, but you do make a report to ULC International Headquarters once every three months stating how many meetings had, how many members you started with and how many you had at the end of the report period; the status of your treasury at the start of the period and at the end. A sample Quarterly Charter Report is provided for you on page 24 of this publication. There is a cost of $2 a month for bookkeeping services at International Headquarters—but *this is your sole responsibility to file reports about your congregation.* The congregation's file maintained at International Headquarters is strictly confidential.

(Emphasis in original.) Plaintiff supplied sample reports in its 1977 pamphlet, Charter Information, which included the following:

SAMPLE CHARTER REPORT

CHARTER NUMBER: 0000

NAME OF CHURCH: Manzanita's Chapel

ADDRESS: 80 Duncan, Apt. 2, San Francisco, CA 94110

DATE: April 1, 1977

REPORT PERIOD: January 1 to March 30, 1977

# OF MEETINGS HELD: 8

AVERAGE ATTENDANCE PER MEETING: 4

TREASUREY [sic]:

Income: $25.00

Disbursements: $11.00

Balance in [Treasury]: $16.00

SPECIAL EVENTS:

We had the privilege to marry a wonderful couple Feb. 20, 1977. Our church is alive and well.

SIGNATURE: Manzanita Hensley, Pastor

(Emphasis in original.) Plaintiff also published an article urging its ministers to read opinions of Tax Court cases.

Plaintiff's textbooks and similar publications included tax-related information, such as reprints of newspaper articles containing tax information. The articles were published without criticism. One such reprint entitled "Divine Tax Dodge" and subtitled "a church saves souls burdened by big tax bills," contained the following passage:

More than 300 Delawareans have paid from $1 to $35 to become ministers in the

Universal Life Church. The heavenly lure is tax exemption.

Kirby J. Hensley, the California contractor who started the church and now claims 7 million instant ministers, says he got so many converts last week that his staff couldn't count them.

"You'd be surprised how everybody wants charters this time of year," he says. "It's so they can get the tax break, you know...."

There were numerous articles of this nature in plaintiff's publications.

Plaintiff's 1983 booklet, How to Start a Congregation, included information about its tax-exempt status; an explanation of its Receipts and Disbursements Program; a copy of plaintiff's tax exemption ruling from the IRS; and an excerpt from the decision in *Universal Life Church, Inc.,* 372 F.Supp. 770, 775–76, discussing the grant of tax exempt status to plaintiff. Similar tax-related information was contained in plaintiff's 1984 *ULC Textbook;* plaintiff's 1986 book, *The Buffer Zone;* and the 1977 official biography of Rev. Hensley. Plaintiff's management seminars, in which its officers as speakers participated, also included tax advice. Rev. Hensley made tax-related statements at church meetings. In an April 18, 1982, meeting, Rev. Hensley stated:

Hensley is the only true Robin Hood that ever came along. "What do you mean the only true Robin Hood?" Well, Robin Hood took it from the rich and gave it to the poor. Hensley takes it from the I.R.S. and gives it back to the man they took it from. [laughter] Don't you think that's about right? Huh?

### 2. *Activities of plaintiff and its congregations*

Plaintiff has repeatedly stated that its members may retain membership in other churches. Congregations would enter into a "Charter Agreement" for which they would make a donation of $5 (in 1973) to $35 (in 1982). Plaintiff's 1977 Charter Agreement included the following provisions;

1. This Church agrees to abide by all the Corporate Laws of the local, state, and federal governments.
2. This Church will report quarterly to International Headquarters. This report will include services held, special meetings, attendance, income, disbursements, and balance of the treasury. Two dollars per month will be sent to International Headquarters for bookkeeping.
3. This Church will have a governing body of at least three people: Pastor, Secretary, and Treasurer. This agreement is signed by the three, individually. International Headquarters must be notified immediately of any change of address.
4. This Church is subject to cancellation if any of the above laws and rules are broken.

....

5. If this Church abides by the laws and rules, we at International Headquarters agree to furnish this Church with a non-profit status. The Corporate number of your State is _____. The Federal tax-exempt number with the Internal Revenue Service is EIN 94–1599959.

Plaintiff's 1981 Charter Agreement was similar, but also included an indemnity clause and authorized the opening of bank accounts in ULC's name. Plaintiff continued to use this 1981 agreement as late as 1986. In its September 1986 Newsletter, plaintiff published a new "Universal Life Church Agreement," which no longer mentioned bank accounts, but pointed to plaintiff's publications as a means for new congregations to determine the responsibilities and advantages of the local church.

In its Spring 1978 Newsletter, plaintiff stated:

When you decide to open a bank account in the name of your church there will be certain forms that you will need to show the bank officials. They will probably want to see your charter and a copy of the IRS exemption letter. Also they might want you to have this office put the official seal on the signature

cards or application. This is not necessary. Open your account as an unincorporated non-profit organization, omitting 'INC' 'ASSOC', etc. This way the seal is not necessary. If this office should place the official seal on the form, we would not only be responsible for the account, but would have control of and access to the account.

Although plaintiff authorized its congregations to open bank accounts in its name, plaintiff does not know how many were actually opened. However, plaintiff estimated a figure in the 65,000 range. In a 1982 Tax Court trial, Rev. Hensley testified: "That congregation has a right to raise money and to expend money as long as it's done for the right thing...." Plaintiff was not the signatory on any of the bank signature cards. Declaration of Lida Hensley July 30, 1987, ¶ 6. The funds of at least 72 of plaintiff's congregations were devoted to nonexempt purposes during the suit years.[4] Plaintiff asserts that it caused 219 accounts to be closed and money transferred to headquarters, Lida Hensley Declr. ¶ 7, but no evidence is offered that these actions were taken due to improprieties on the part of congregations. Moreover, the order of October 2, 1987, pursuant to the preclusive order of November 21, 1986, struck plaintiff's responses to defendant's statement of uncontested material facts based on plaintiff's failure to produce information concerning its terminating the authority of ULC congregations to use bank accounts. *See supra* note 2. Even after the formation of plaintiff's Receipts and Disbursements Program, discussed above, plaintiff did not require the closing of individual congregations' bank accounts.

In addition to its quarterly reports, annual receipts were prepared in cases of individual audits. According to his testimony in a tax case, Mr. Imbeau, an officer of plaintiff, signed "absolutely thousands" of the annual receipts using the services of five staff members to perform the associated clerical work. Plaintiff checked to veri-fy contributions for preparation of an "Annual Receipt" against each congregation's quarterly report. The quarterly report did not require identification of donors. *See* "Sample Charter Report" quoted *supra.*

Plaintiff cannot rebut defendant's assertions regarding plaintiff's correspondence with the IRS because of the preclusive order entered on November 21, 1986. *See supra* note 2. Plaintiff failed to produce all of the correspondence sent to the IRS, producing only 193 documents, and was unable to even estimate the number of copies sent out on behalf of individual congregations.

Plaintiff engaged in substantial correspondence with the IRS on behalf of its congregations. During the period May 1, 1977, to present, it has been plaintiff's general practice, on learning that the IRS had disallowed deduction of contributions to one of its charters, to send a letter to the IRS. A form letter was used with the name of the taxpayer and congregation inserted. An example letter follows:

Your correspondence to the above donors has been forwarded to this office for review and reply. On behalf of the Universal Life Church, Inc. a bona fide Church and religious denomination organized and operated exclusively for religious purposes, a formal protest is hereby made for an unlawful interrogation about the Church and its operations and activities of its donors.

*Our records show that they are members in good standing in the Church and regular donors to it.* We are a recognized Church and religious organization with a Letter of Decision granted by judicial decree of the Federal Courts and issued by the Internal Revenue Service, a copy is enclosed for your use.

We have informed them that any interrogation about the Church and its operations and their affiliation and beliefs are privileged and inviolate and cannot be

---

**4.** The cases so ruling are listed in defendant's reply to plaintiff's statement of genuine issues, filed Sept. 14, 1987, at pp. 205–211. Plaintiff took the position that the cases are irrelevant.

Since defendant submitted its proposed findings, two other cases have been decided. *Burwell v. Comm'r,* 89 T.C. No. 41 (1987); *Roughen v. Comm'r,* 54 T.C.M. (CCH) 510 (1987).

answered except by their ecclesiastical superiors, the Board of Directors of Universal Life Church, Inc. in Modesto, California.

They have copies of our "Annual Receipt of Contributions" to the Church which are legal documents attesting to their giving to a qualified deductable [sic] organization. A copy of the [addendum] section to the supplement to Publication 78 (Rev. 3–82) is enclosed for your perusal.

*All contributions to the Church become the sole property of the Church Corporation which is a domestic organization. The assets of which are irrevocably dedicated to religious purposes and no part inures to the benefit of any officer, director or member thereof or to the benefit of private individuals.*

. . . .

*Our records show that they have in no way benefited from their affiliation or contributions except for the religious purposes of the Church and its legal activities.* The general management of the church is under the control of its legally elected Board of Directors. No one person has authority to act or speak for the Corporation except its Board of Directors.

The continued harassment of those contributing to the Church by members of the Internal Revenue Service is intolerable and will not long be endured by the Christian Community. The Church intends to continue its fight for the First Amendment Rights guaranteed by the Constitution of the United States, all the way to the Supreme Court if necessary.

(Emphasis added.) Plaintiff would send out such letters without even confirming whether contributions had been made or whether the congregation to which the alleged donation was made was active. Plaintiff did not confirm that the money contributed was used for exempt purposes. In one 15–month period, plaintiff sent 1,194 letters, in one month 205 letters, and in one day alone 41 letters. More than 90 percent of this activity was on behalf of congregations affiliated with the Church of Universal Harmony ("Universal Harmony").

Plaintiff's officers testified on behalf of its congregations in Tax Court suits. Universal Harmony is a major example. Plaintiff maintained a close affiliation with Universal Harmony and its directors, Michael S. McGinnis and Dennis R. Riness, both of whom subsequently were indicted for tax fraud, with Mr. Riness pleading guilty to conspiracy. Universal Harmony was a chartered congregation of plaintiff, operating as a franchise bringing new charters to plaintiff for a fee of $100 each. Universal Harmony was preassigned blocks of charter numbers in order to process new congregations. Universal Harmony maintained correspondence with plaintiff involving legal and receipt forms to be used by congregations; execution of documents to open bank accounts; transmission of quarterly reports; and records of ordination of ministers, along with other routine correspondence. An indication of the close affiliation existing between Universal Harmony and plaintiff is demonstrated in a July 19, 1979 letter from plaintiff:

Gentlemen:

This letter is written to confirm that a formal relationship exists between Universal Life Church, Inc., and the Church of Universal Harmony, an integral part of Universal Life Church, to promote among other things, the teachings of the Universal Life Church, Inc., and to recruit new members on its behalf.

You are authorized to ordain ministers in the name of Universal Life Church, Inc., to issue charters in the name of the Universal Life Church, Inc., and to help all who are interested to properly set up and maintain a chartered Universal Life Church congregation in the Southern California area from Los Angeles to San Diego County.

You are further authorized to make official appearances on behalf of the Universal Life Church, Inc., and its chartered congregations in your area as may be needed from time to time, i.e., state and federal government offices, IRS audits, etc.

These authorizations shall remain in effect as long as you continue to "do that

which is right" and remain on good terms with the main church in Modesto.

Very truly yours,

Bishop Kirby J. Hensley, D.D.
President

Similar letters were sent on December 5, 1979, and December 16, 1980. In a March 1983 letter, plaintiff acknowledged its relationship to Universal Harmony ministers and emphasized that they were part of the Universal Life Church, Inc. Plaintiff also wrote letters to the IRS, at the request of Messrs. McGinnis and Riness, for members of Universal Harmony. For example, plaintiff sent a letter of behalf of one Fran Huspeck whom Messrs. McGinnis and Riness helped to prepare a fraudulent IRS 1040 Form. In addition, plaintiff prepared an "Annual Receipt" for Ms. Huspeck.

In 1983 Universal Harmony broke with plaintiff. Plaintiff did not obtain the property of the congregations that had broken away. In addition to the tax fraud perpetrated by Universal Harmony, plaintiff claims to be unaware of other nonexempt activities engaged in by various individuals and congregations. The activities by its congregations included, but were not limited to, criminal cases of fraud and conspiracy;[5] the promotion of illegal drug use in an article in plaintiff's newsletter; and sponsorship or operation of fan clubs, a fantasy phone line, sex clubs, a discotheque, and a restaurant.

Plaintiff's alleged lack of awareness of nonexempt activities is refuted by several reports. For example, congregation No. 37608 reported in 1982 a total of nine "missionary" or "proselyting" trips to South America, the Galapagos Islands, Minnesota, and Oregon. The only explanation for the trip to South America and the Galapagos Islands was the congregations were "studying like Darwin the origin of the species." Plaintiff, as in response to other reporting, did not inquire beyond the information supplied.

Plaintiff may not have endorsed or promoted any of these nonexempt activities, but it cannot claim that it was unaware of them.

## DISCUSSION

Summary disposition requires that no genuine dispute exist as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor...." *Anderson,* 477 U.S. at ——, 106 S.Ct. at 2513 (citation omitted). As the opponent of summary judgment, plaintiff shall "receive the benefit of all applicable presumptions, inferences, and intendments." *Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The court should "resolve all doubt over factual issues in favor of the party opposing summary judgment." *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985).

The movant has the burden of establishing that there is no material fact in dispute and that it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Molinaro v. Fannon/Courier Corp.,* 745 F.2d 651, 653–54 (Fed.Cir.1984). A summary judgment motion must be denied if a genuine issue of material fact exists. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. However, the party opposing the motion has the burden of showing sufficient evidence, not necessarily admissible at trial, that there is a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); "Mere denials or conclusory statements are insufficient." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d

---

**5.** *United States v. Adu,* 770 F.2d 1511, 1512 (9th Cir.1985), *cert. denied,* 475 U.S. 1030, 106 S.Ct. 1235, 89 L.Ed.2d 343 (1986), involved a member of plaintiff's board. *See also United States v. Heinemann,* 801 F.2d 86 (2d Cir.1986), *cert. de-*

nied, —— U.S. ——, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987); *United States v. Turner,* 799 F.2d 627 (10th Cir.1986); *United States v. Gleason,* 753 F.2d 83 (8th Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 801, 88 L.Ed.2d 777 (1986).

831, 836 (Fed.Cir.1984). The materiality of the facts before the court will be viewed in light of the legal standard to be applied to the case. *Anderson*, 477 U.S. at ——, 106 S.Ct. at 2510.

Two factors to be considered in deciding if a case is a proper one for summary judgment are whether the material facts necessary for decision have been adequately developed, as required by RUSCC 56(c), and whether further litigation would put the parties to unnecessary expense and would also waste judicial resources. The Supreme Court emphasized the importance of Fed.R.Civ.P. 56 for purposes of judicial economy in *Celotex Corp.:* "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 106 S.Ct. at 2555, (quoting Fed.R.Civ.P. 1, which is identical to RUSCC 1(a)(2)); *see also Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984); *Frangella Mushroom Farms, Inc. v. United States*, 229 Ct.Cl. 578, 583 (1981).

In *Universal Life Church, Inc. v. United States*, 9 Cl.Ct. 614 (1986) (order denying motion for summary judgment), Judge Miller held that defendant was not collaterally estopped by the district court's decision in *Universal Life Church, Inc. v. United States*, 372 F.Supp. 770 (E.D.Cal. 1974), from reexamining the church's tax-exempt status, so long as there was a change in circumstances that justified defendant's action. *Accord Universal Life Church, Inc. v. United States*, 76–2 U.S.T. C. (CCH) ¶ 9548, at 84–744 n. 3 (E.D.Cal. 1976) [Available on WESTLAW, 1976 WL 1075]. Second, Judge Miller ruled that there was a genuine issue whether contributions to the church, in fact, had inured to

the benefit of individuals. The court found that defendant had failed to show that contributions made to various congregations were part of plaintiff's net earnings. 9 Cl.Ct. at 618.

The motion now before the court is based upon a different ground relied on by the IRS to revoke plaintiff's exempt status. Defendant claims that plaintiff is being operated for a substantial nonexempt purpose in violation of I.R.C. § 501(c)(3), which requires that charitable organizations be operated exclusively for tax-exempt purposes.

The question to be considered is whether, giving full consideration to the factors enunciated above and looking at the evidence before the court in a light most favorable to plaintiff, there is a genuine issue of material fact concerning the substantive issue. In so doing the court cannot weigh the evidence and determine the truth of the matter. *Anderson*, 106 S.Ct. at 2511. The substantive issue is whether plaintiff's providing tax advice and tax-related information is a substantial nonexempt purpose and whether plaintiff's awareness and tacit approval of the activities that its congregations engaged in is fatal to its tax-exempt status.

Defendant correctly has stated that whether plaintiff constitutes a single church or a church at all is not at issue in this case. For purposes of this decision, plaintiff's status as a single church is accepted.[6] The religious doctrine allowing members to decide that which is right for them also is recognized as legitimate.

■ It is not within this court's purview to judge in this motion the legitimacy of plaintiff's religion. However, it is legitimate for the court to decide plaintiff's status under I.R.C. § 501(c)(3). "Exemption from taxation as a church is not a right, but a matter of legislative grace."

---

**6.** In *Universal Life Church,* 9 Cl.Ct. at 618, Judge Miller deemed defendant's argument that plaintiff was a single entity inconsistent with the position defendant had taken in the Tax Court cases, brought by congregations, *see id.* at 618 n. 2, since defendant there asserted that the individual taxpayer congregations were not covered by ULC's exemption. Plaintiff always has maintained that it is a single entity. The fact that defendant has taken a different view in the Tax Court cases does not prevent it from agreeing with plaintiff in this court. However, Judge Miller also drew the distinction that the findings in the Tax Court cases did not support defendant's theory that plaintiff's net earnings inured to the individuals.

*Church of Visible Intelligence That Governs the Universe v. United States,* 4 Cl.Ct. 55, 65 (1983) (citing *Christian Echoes Nat'l Ministry, Inc. v. United States,* 470 F.2d 849, 854) (10th Cir.1972), *cert. denied,* 414 U.S. 864, 94 S.Ct. 41, 38 L.Ed.2d 84 (1973)).

In *Better Business Bureau v. United States,* 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945), the Supreme Court provided the test controlling the decision in this case. In holding that the *Better Business Bureau* was not exempt from social security taxes, the Supreme Court stated:

[I]n order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes.

326 U.S. 283, 66 S.Ct. at 114. The Court went on to say that it was unnecessary "to determine the correctness of the educational characterization of petitioner's operations," *id.,* as it is unnecessary to determine the legitimacy of plaintiff's religion for this case. It will suffice that defendant demonstrate that providing tax advice and tax-related material is a substantial purpose of plaintiff.

### 1. *Whether tax advice constitutes nonexempt purpose*

In support of its motion, defendant provides numerous examples of plaintiff's supplying tax information to the ministers of its congregation. Merely providing necessary tax information is not a nonexempt purpose. *See Ecclesiastical Order of the ISM of AM, Inc.,* 80 T.C. 833 (1983), *aff'd,* 740 F.2d 967 (6th Cir.1984), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). However, as the Tax Court observed:

There is a big difference between *informing* members that ministers may be entitled to special tax benefits, *as an incident* to carrying on primarily religious activities, and *suggesting innumerable* methods by which ministers can *maximize* tax benefits, which is carried on as *a substantial activity* in and of itself.

80 T.C. at 840–41 (emphasis in original). Defendant asserts that plaintiff's newsletters are its primary means of communicating with ministers, that tax advice is disseminated to ministers through plaintiff's newsletters, and that such advice pervades plaintiff's newsletters. In addition, defendant contends that plaintiff's texts and manuals are also replete with tax advice and other information relating to tax avoidance. Defendant also points to other publications, plaintiff's oral presentations, and Rev. Hensley's use of agents to dispense tax advice. It is defendant's contention that since plaintiff disseminates information to the ministers of its congregations, through its publications as the only means by which the congregations are given guidance, there is an expectation that the ministers relied on the information contained therein. Since plaintiff had knowledge of the contents of its publications, according to defendant, it should have also known and warned against the use of the church for tax avoidance purposes. In these circumstances defendant argues that the disclaimer contained in plaintiff's publications was insufficient guidance.

Plaintiff responds that the information provided through news stories, letters, cartoons, and other items constitutes an exercise of its First Amendment rights to freedom of speech and freedom of the press and an exercise of its religious beliefs. According to plaintiff, the tax-related items represent "truly miniscule percentages of the contents of the newsletters presented." In fact, as defendant concedes, plaintiff's publications addressed tax issues "in a lesser amount than religious issues." The court would not attempt to deprive plaintiff of the right to publish tax-related materials in its publications, but including tax information must further exempt purposes and plaintiff must bear the responsibility for the subsequent use of the information.

Plaintiff cites *United States v. American College of Physicians,* 475 U.S. 834, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986), to support the proposition that the court

should not review the quality of its advertisements. In *American College of Physicians*, the Supreme Court determined that advertisements did not serve a substantial educational purpose and therefore that the revenue generated therefrom was not tax exempt. This decision is inapposite, since the advertisements in this case are not reviewed in the context of revenue production, but, rather, for plaintiff's awareness of their content and the conduct they would be expected to encourage.

■ Plaintiff objects to defendant's characterization of its publications as "featuring" tax-related information. Plaintiff claims that since tax-related information does not predominate in its literature, it cannot be considered featured. The determination of whether it is substantial and therefore nonexempt does not depend on the quantity of tax-related material in comparison with the other material in the publications. Exclusivity does not mean solely or without exception, but nonexempt activities must be incidental and insubstantial. Treas.Reg. § 1.501(c)(3)(1). Thus, the determination is made by taking the information disseminated by plaintiff separately and determining if such material as disseminated is incidental to religious purposes and less than substantial. Although this determination appears to call for weighing of evidence, that is not the case if there is no contest with the tax-related material and information of record. Plaintiff objects only to the context. For example, plaintiff either makes no response to the references in Rev. Hensley's sermons to tax avoidance or claims that they are taken out of context. The statements, however, are not denied, and after reviewing all of plaintiff's objections, the court has considered only statements that stand on their own and are not dependent on any context, such as the ones quoted in the factual discussion, which are representative of the tax-related information given by plaintiff.

In quantitative terms tax advice and tax-related information does not predominate in plaintiff's newsletters, textbooks, publications, or sermons. However, a review of the materials in the record, the accuracy of which is uncontested, indicates that plaintiff at the very least should have been on notice that its publications contained tax advice and related information. Plaintiff cannot deny Rev. Hensley's public statements regarding taxes and ULC's ability to make its ministers rich. However, since defendant has conceded that plaintiff's publications included tax-related information in a lesser extent than religious and plaintiff since has averred through a ULC director that of the 2,000 pages of church newspapers and related documents submitted by plaintiff 1 percent mentions taxes (even less if classified advertisements are excluded), Lowarch Declr. ¶ 5, plaintiff argues that a genuine issue of fact exists whether plaintiff's "entire existence is permeated with the purpose of counseling taxpayers on tax matters." *Ecclesiastical Order of the ISM of AM, Inc.*, 80 T.C. at 842.

The court agrees that the evidence marshalled by defendant in this case does not demonstrate that tax information and advice permeates plaintiff's literature to the same extent as in the stipulated *ISM of AM* case. However, the undisputed evidence of record supports the finding that tax advice and information contained in plaintiff's newsletters, even excluding advertisements, is so highlighted and emphasized in its format, appearing on almost every page of the newsletters that, it is within the contemplation of *Better Business Bureau* as demonstrating a substantial nonexempt purpose—the giving of tax advice. The record cannot support the finding—or create an issue about the facts—that plaintiff's tax advice to its congregations was incidental to its primary purpose of disseminating religious advice to its ministers and membership.

There is a related approach to determining whether plaintiff engaged in tax advice or any other substantial nonexempt purpose. The information disseminated can be considered in conjunction with the activities of plaintiff and its congregations to identify the presence of a single nonexempt purpose, such as tax advice or tax avoidance. *See Christian Stewardship Assistance v. Comm'r*, 70 T.C. 1037 (1978) (petitioner's assistance to charitable organiza-

tions in their fundraising activities failed to qualify for exemption because private benefits substantial and thus nonexempt purpose substantial).

2. *Whether the activities of plaintiff and its congregations constitute a substantial nonexempt purpose*

Defendant argues that an organization's activities are indicative of its purposes. The court agrees. Any examination of plaintiff's activities during the suit years and thereafter leads to the conclusion that plaintiff's focus on tax matters played more than an insubstantial part of its activities. From 1977 to present, plaintiff has not concerned itself with the activities of its individual congregations. This may be in keeping with the doctrine that individual members need only do that which its right for themselves, but it is enlightening for purposes of this summary judgment determination.

■ One important area in which plaintiff specifically has provided advice and guidance to its congregation is in the tax area. Plaintiff has called on its congregations to maintain filings to headquarters to retain tax-exempt status and proposed that individuals attend meetings in order to find out how to obtain the "privileges" of the ministry. Rev. Hensley also has proclaimed himself Robin Hood standing between individuals and the IRS, among other similar statements. No matter how sincere and expansive plaintiff's other beliefs, the record contains many examples of nonexempt activities aimed at tax avoidance. Plaintiff's assertion that it is a "single entity" with all congregations making up the whole has been accepted for purposes of this decision. This status imposes on plaintiff, as the central organization, a duty to be aware and ensure that each affiliate operates exclusively for exempt purposes. Plaintiff has failed in this duty.

Plaintiff provided in its 1980 *ULC Book* a sample receipt to be used for contributions made to congregations, which included plaintiff's tax-exempt number. There was no central control over the funds donated to the church. In fact, plaintiff in its Spring 1978 Newsletter stated its desire not to become involved with individual congregation's bank accounts: "[I]f this office should place the official seal on the form, we would not only be responsible for the account, but would have control of and access to the account." Plaintiff did not require that it be involved in the opening of bank accounts, although it recognized that some banks may have such a requirement, nor was plaintiff aware of the number of accounts opened in its name. Even though plaintiff was unaware of the number of accounts and the purpose for which the funds were being used, it provided on request annual receipts to substantiate contributions.

Plaintiff has assisted in the abuse of, or failed as the central organization to prevent abuse of, its tax-exempt status. Activities of this nature include providing receipts to an unsponsored fund and engaging in letter writing to the IRS without regard to the circumstances for disallowance of tax deductions. Plaintiff's officers have testified on behalf of nonexempt organizations in the Tax Court based solely on quarterly reports and not on personal knowledge about the activities of congregations.

A glaring example of plaintiff's lack of control or awareness of its charter organization's activities is Universal Harmony. Plaintiff maintained a close affiliation with this church, a franchise operation which, with plaintiff's permission, sold charters in plaintiff. Universal Harmony was provided with blocks of charter numbers to process new organizations. Universal Harmony maintained close ties with plaintiff through correspondence in which it provided information about its fraudulent activities, sought advice, and made payments to plaintiff.

Plaintiff continually asserted its close affiliation with Universal Harmony and the individuals who ran the organization. Plaintiff's support included letters from plaintiff authorizing Universal Harmony to ordain ministers and to issue and set up charters in plaintiff. Plaintiff made a

statement that all of Universal Harmony's congregations were part of plaintiff.

It is clear that Universal Harmony was operated for the purpose of tax evasion. Plaintiff's affiliation with and aid in the fraud scheme, either wittingly or unwittingly, is irrelevant for purposes of defendant's motion. Plaintiff's lack of knowledge is sufficient to find that plaintiff has exhibited a complete lack of control and awareness of the activities of its congregations. This lack of awareness led to an abuse of the exemption privilege by allowing Universal Harmony and other individual congregations to be operated for nonexempt purposes and by supporting Universal Harmony in its efforts.

This was not the sole example of plaintiff's allowing its congregations to engage in nonexempt activities. A member of plaintiff's Board of Directors remained on the board after being convicted for acts of criminal tax fraud. Defendant also provided examples of other individuals convicted for tax fraud, who used plaintiff for purposes of tax evasion. Plaintiff objects that these examples are irrelevant, since it did not authorize the activities. The unrefuted facts, however, are simply illustrative of plaintiff's complete lack of control or knowledge of its congregations' activities.

Finally, defendant provides examples of some of the activities that were not engaged in for religious purposes by chartered congregations that operated under the name of plaintiff, such as the discotheque and restaurant. Plaintiff objects that the examples are irrelevant. To the contrary, these examples illustrate plaintiff's knowledge that individual congregations were being operated for non-exempt purposes and plaintiff's failure to remedy the situation. Plaintiff cannot claim that it was unaware that congregations were operated for nonexempt tax purposes, if for no other reason than that its publications frequently reported their activities.

■ The question is whether plaintiff has been operated exclusively for religious purposes. In order to make this determination, a determination must be made whether the nonexempt activities of plaintiff were incidental to its religious purposes. *See American Institute for Economic Research v. United States,* 157 Ct.Cl. 548, 302 F.2d 934, 938 (1962), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141 (1963). In *Scripture Press Foundation v. United States,* 152 Ct.Cl. 463, 285 F.2d 800 (1961), the court concluded: "[T]he intensity of the religious convictions of the plaintiff's members and officers cannot operate to exempt them from the tax law if the activities of the plaintiff cannot in themselves justify such an exemption." 152 Ct.Cl. at 469–70, 285 F.2d at 804; *see Iowa State University of Science & Technology v. United States,* 205 Ct.Cl. 339, 500 F.2d 508 (1974). Review of plaintiff's activities reveals substantial nonexempt purposes. The activities were conducted with plaintiff's knowledge, if not its approval. Plaintiff's failure to take any action to correct or in any way criticize the abuse by its congregations of I.R.C. § 501(c)(3), falls within the description of a substantial nonexempt purpose set forth by the Supreme Court in *Better Business Bureau.* 326 U.S. at 283, 66 S.Ct. at 114. Plaintiff's claim that it is a single entity is accepted, but along with this recognition plaintiff must bear the responsibility for its congregations' actions. Plaintiff is not held responsible for every nonexempt activity engaged in by individual congregations, but the nonexempt activities of the congregations, the tax-related information in plaintiff's publications, and plaintiff's own statements support the ultimate finding and conclusion that plaintiff is not being operated exclusively for exempt purposes. Substantial nonexempt purposes of giving tax advice not incidental to religious purposes and promoting tax avoidance have been demonstrated.

The court's insistent inquiry has been why should this case be decided on motion when typically these cases are tried or decided on stipulated facts? If, however, summary judgment is to play the role charted by the Supreme Court in *Celotex Corp.* and *Anderson,* it is this record that commends summary disposition. Plaintiff has advanced no plausible argument, evi-

dence, or averment that would justify a trial.

Plaintiff has failed to raise a genuine issue of material fact by offering any evidence, even inadmissible evidence, to put in issue defendant's evidence establishing that for the tax years in issue plaintiff was operated for a nonexempt purpose.[7]

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

Jessie L. Evans, Jackson, Miss., for plaintiff.

J. Keith Burt, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

---

**7.** Revisiting Judge Miller's denial of defendant's first motion for summary judgment, defendant renewed its earlier motion. The foregoing dis- position makes unnecessary consideration of other grounds upon which defendant may be entitled to summary judgment.