**UNIVERSAL LIFE CHURCH, INC.,**
**Plaintiff,**

**v.**

**UNITED STATES of America,**
**Defendant.**

**Civ. No. S–1954.**

United States District Court,
E. D. California.

March 1, 1974.

Peter R. Stromer, Gonzales & Stromer, San Jose, Cal., for plaintiff.

Dwayne Keyes, U. S. Atty., Richard W. Nichols, Asst. U. S. Atty., Sacramento, Cal., Harold S. Larsen, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

ORDER

FINDINGS OF FACT

BATTIN, District Judge.

1. This is a civil action for the refund of $10,377.20 in income taxes for

1. The first-year period of probation shall commence as of March 1, 1974.

the fiscal year ended April 30, 1969. This Court has jurisdiction pursuant to Sections 1346(a)(1) and 1346(c) of Title 28 United States Code and Section 7422 of Title 26 U.S.C.

2. The defendant, by a counterclaim, seeks recovery of $721.87 in income tax together with $507.77 in assessed interest or a balance of $1,229.64 together with interest thereon.

3. This matter came on for hearing on September 17, 1973. Peter R. Stromer appeared for the plaintiff and Harold S. Larsen appeared for defendant. Both parties waived jury trial, and, following a partial stipulation of facts, the matter was taken under advisement.

4. At pretrial, defendant conceded that plaintiff is organized and duly incorporated as a non-profit corporation pursuant to California law. Defendant further conceded that plaintiff's activities may be admittedly religious in nature but defendant contended said activities are not religious per se within the scope of Internal Revenue Code Section 501(c)(3).

5. Plaintiff's Articles of Incorporation read, in pertinent part:

This corporation is one which does not contemplate pecuniary gain or profit to the members thereof and it is organized solely for non-profit purposes. Upon the winding up and dissolution of this corporation, after paying or adequately providing for the debts and obligations of the corporation, the remaining assets shall be distributed to a non-profit fund, foundation or corporation which is organized and operated exclusively for charitable, religious and/or scientific purposes and which has established its tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.

6. In its Memorandum in Support of its Requested Jury Instructions, defendant cited but two issues which it claimed as the basis for denial of plaintiff's tax-exempt status:

(1) Whether the ordination of ministers, the granting of church charters, and the issuance of Honorary Doctor of Divinity titles by plaintiff are substantial activities which do not further any religious purpose, thus disqualifying plaintiff from tax exemption; and

(2) Whether the issuance of Honorary Doctor of Divinity titles by plaintiff is an activity which is either illegal or in violation of public policy under the California Education Code Section 29007.

7. Defendant admitted in its Memorandum in Support of its Requested Jury Instructions that the ordination of ministers and the chartering of churches are accepted activities of religious organizations.

8. Oral argument was presented, in addition to the written briefs, pleadings, depositions, and exhibits, re the California Education Code Sections 29001, 29007, and 29020. Plaintiff contended and defendant opposed the contention that by virtue of Education Code Section 29020 plaintiff was excluded from the proscriptions re issuance of the Honorary Doctor of Divinity title found in Education Code Section 29007.

9. Expert testimony by way of depositions from Reverend Theodore Mackin and Reverend Lester Kinsolving have been submitted with respect to the Honorary Doctor of Divinity title, subject to defendant's objection.

10. Reverend Theodore Mackin testified by deposition that he is an associate professor of religious studies and Chairman of the Department of Religious Study at Santa Clara University, Santa Clara, California. He further designated his religious affiliation as S. J. (Society of Jesus), commonly referred to as the Jesuits. He stated that he had a certain expertise in the field of religion, especially in the field of religious studies. He stated that based upon his personal knowledge, following individual research of documentary sources and discussions with his professional colleagues,

that the Honorary Doctor of Divinity is a strictly honorary religious title without academic standing. (Mackin deposition, page 5, lines 11–21.) Father Mackin further testified that the Honorary Doctor of Divinity title is not awarded by degree-conferring institutions to persons as the consequence of their having completed programs of study, within the conferring and/or other institutions, designed to earn the rank/title of "doctor". (Mackin deposition, page 6, lines 10–19.)

11. Reverend Lester Kinsolving testified via deposition that he is an ordained Episcopal priest, having been in the parochial ministry of his church for some fourteen years and was now a full-time journalist, a religion writer for the San Francisco Examiner, and a religion columnist for the National Newspaper Syndicate whose column is carried in two hundred fifty-four daily newspapers in forty-six states and Canada with a readership of over nine million. (Kinsolving deposition, page 2, lines 17–25.) He corroborated the testimony of Father Mackin as to the Honorary Doctor of Divinity title in all particulars. When asked specifically whether an Honorary Doctor of Divinity title, labeled on its face as an Honorary Doctor of Divinity (defendant's Exhibit E), came under the proscriptions found in the California Education Code, specifically Education Code Section 29007, Rev. Kinsolving replied, "Obviously not." (Kinsolving deposition, page 49, line 22.) Rev. Kinsolving further testified that the way Honorary Doctor of Divinity degrees have been used in so many instances represented a kind of stock in trade. "In other words, you almost sell them." (Kinsolving deposition, page 56, lines 4–7.)

12. Further deposition testimony was submitted into evidence, namely depositions of Reverend Kirby J. Hensley, Lida Louise Hensley, and Alexander Dias DeBettencourt. All exhibits identified in connection with the above depositions were stipulated for use herein with the exception of a Minute Book of the Board of Directors' meetings of plaintiff corporation. Pretrial ruling by Judge MacBride allowed the Minute Book, defendant's Exhibit A, to be used herein.

*Kirby J. Hensley deposition*

13. Rev. Hensley testified that the church was incorporated in 1962. He testified that a garage at his residence, 1766 Poland Road, Modesto, California, had been converted into a church and chapel. Meetings were held every Sunday morning, with occasional special meetings on other days and evenings. He testified that charitable efforts engaged in by the church which have been recognized by state and local governmental sources included taking people off the welfare rolls and training them in productive jobs for which state and local government paid half the wages so earned. (Kirby J. Hensley deposition, page 14, lines 4–8.)

14. Rev. Hensley further testified that the Honorary Doctor of Divinity program was developed since the church policy allowed ministerial credentials to be conferred gratis upon anyone on request and upon new ministers who were seeking information on ministerial procedures. (Kirby J. Hensley deposition, page 21, lines 18–25.) The lesson plans (defendant's Exhibits G through L) cover basic church functions, how to conduct services, marriage, baptismal ceremonies, burial services, etc. The lesson plans were mailed out or otherwise distributed on request with the Honorary Doctor of Divinity as a course of instruction in the principles of the church. Rev. Hensley further identified a Marriage Certificate, a Marriage Record, a Charter Agreement, a Charter, an Information Sheet and an issue of the church newspaper. (Defendant's Exhibits Q and R. Plaintiff's Exhibits Nos. 2 through 5.)

15. Rev. Hensley further testified that the church had volunteered its facilities for rehabilitative purposes involving people seeking employment following incarceration in prison. (Hen-

sley deposition, page 59, lines 16–26, et seq.)

16. Further testimony re issuance of church charters (plaintiff's Exhibits Nos. 2 and 3) indicated that plaintiff required all churches chartered by it to agree to abide by the corporate laws of the State, that each church have a pastor, secretary and treasurer, that annual reports be made to plaintiff's headquarters in Modesto, California, and that any church found to violate a state law would be subject to having its charter cancelled. (Kirby J. Hensley deposition, page 61, lines 12–26.)

17. Rev. Hensley testified that his philosophy which he conveyed to all his ministers is to do whatever is right. (Kirby J. Hensley deposition, page 62, lines 9–11.)

18. When asked about the doctrine of the Universal Life Church, plaintiff herein, Rev. Hensley stated that the church is "all built around" the following principles: "The Universal Life Church has no traditional doctrine. It only believes in that which is right. We believe that everyone has a right to his own conviction, a right to express it, and we recognize everyone's belief." (Kirby J. Hensley deposition, page 62, lines 23–26, and page 63, lines 1–2.)

19. Rev. Hensley testified that he had performed marriages and baptisms and officiated at funerals and typical church functions. (Hensley deposition, page 74, line 24, and page 75, lines 24–25.) He further averred that he had always counseled and told plaintiff's ministers to do whatever's right, to stay within the confines of the law. (Hensley deposition, page 89, line 1–4.)

*Lida Louise Hensley deposition*

20. Mrs. Hensley testified she had been married to Kirby J. Hensley, plaintiff's president, since 1952 and had been associated with the Universal Life Church since it began in 1959. She testified that weekly services were held with a number of named individuals still in regular attendance to the date of the deposition, approximately a dozen years later. (Lida Hensley deposition, page 9, line 4 et seq.) She averred that the church from its inception had issued church charters, published a church newspaper, conferred ministerial credentials and issued Honorary Doctor of Divinity titles upon completion of a set of lesson plans constituting a course of instruction in the church's principles. She further testified that plaintiff had used the name "Universal Life Church, Incorporated," from its very beginning. In all tax returns forwarded by plaintiff, its activities were described as religious services, preaching, etc., "to have services and preach and teach and things like that." (Lida Hensley deposition, page 37, lines 11–12.)

21. Mrs. Hensley indicated plaintiff had received a property tax exemption as a church on its property from the Tax Assessor of Stanislaus County, the county where the church headquarters has been located since its inception. She testified her husband had a knowledge of the Bible and she assisted him in church services, services which include membership participation, analogous to a congregationalist type of service. She identified plaintiff's Exhibit No. 5 as a copy of the church newspaper and described its contents. A picture which appeared therein bore the following caption: "Advocates of the Good Life: Our goal—a fuller life for everyone. Our objective—eternal progression. Our slogan—to live and help live. We want to be competent, to be proficient, to be cooperative, to love our fellow man, to appreciate, to be humble, to be honest, to be moral, to live positively, and to be what we profess." She went on to describe another picture and caption from the newspaper as follows: "Well, that is a picture of the heads of most races of people, and says Universal understanding and brotherhood will bring peace." (Lida Hensley deposition, pages 50–51.) She affirmed that the above description typified and exemplified the philosophy of the plaintiff.

22. Mrs. Hensley further indicated that the church newspaper carried a church directory and a ministers directory as well as articles from people of almost all religious faiths, "—more or less people that are striving for a better way spiritually, physically and mentally a better way of life. Not just for themselves, but for every human being." (Lida Hensley deposition, page 52, lines 13–26, and page 53, line 1.)

*Deposition of Susetta Lykins*

23. Susetta Lykins testified that she is a member of the Board of Directors of plaintiff. She has attended church services regularly and considers plaintiff to be her regular church. She indicated she had also attended annual conventions of the church for a period beginning more than five years ago. (Susetta Lykins deposition, page 8.)

*Deposition of Audie Gardner*

24. Mr. Audie Gardner, a resident of Modesto, California, testified he had gone to plaintiff church ever since 1962 and had attended both church meetings and meetings as a member of plaintiff's Board of Directors for seven years. (Gardner deposition, page 5.) He testified that sometimes church attendance was low and sometimes he had seen 100 people in attendance. Mr. Gardner further averred that his wife had started going to plaintiff's services before he did and had encouraged his participation. Mr. Gardner testified that all major decisions which affected the church were done with the Board of Directors' approval. (Gardner deposition, page 12.)

*Deposition of Alexander Dias De-Bettencourt*

25. Mr. DeBettencourt testified he was an ordained minister of the Universal Life Church and a former member of its Board of Directors, having served in the latter capacity from May 4, 1969, to November 14, 1970. (DeBettencourt deposition, page 6, lines 1–2.) He testified that to the best of his knowledge all the activities of plaintiff have been exclusively religious in nature as long as he was on the Board. (DeBettencourt deposition, page 10, lines 24–26, and page 11, lines 1–3.) He testified that he had attended Divinity School and had preached for the Methodist Church for six years, but had, in essence, converted to the Universal Life Church. (DeBettencourt deposition, page 13.)

26. Documentary evidence submitted shows that plaintiff was incorporated in the State of California on May 2, 1962 Exhibit A filed with the complaint is a file-endorsed copy of plaintiff's Articles of Incorporation as amended. Said Articles show that plaintiff is organized pursuant to California law as a non-profit corporation with its property irrevocably dedicated to religious purposes and no part of its net income or assets shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private persons.

27. California Education Code defines "degree" in Section 29001 as any "academic degree" or "honorary degree" . . . which signifies, purports or is generally taken to signify satisfactory completion of the requirements of an academic, educational, or professional program of study beyond the secondary school level or is a recognized honorary title conferred for some meritorious recognition.

28. California Education Code Section 29007 proscribes the issuance of any academic or honorary "degree" or "title" . . . which signifies, purports or is generally taken to signify satisfactory completion of the requirements of an academic or professional program of study beyond the secondary school level unless specified accreditation or financial standards are met.

29. California Education Code Section 29020 excludes the provisions of Sections 29003 to 29010 inclusive, of the Education Code, from applying to any diploma or course of instruction given by a bona fide church or religious denomination if such course is limited to

instructions in the principles of that church or denomination.

30. Plaintiff's initial claim for refund on April 17, 1970, was for $10,377.-20, being the amount levied against plaintiff's bank account by the Internal Revenue Service on March 19, 1970. Subsequently, the District Director of the Internal Revenue Service, on February 9, 1971, mailed to plaintiff a notice of deficiency totalling $11,099.07, including the amount already collected via levy upon plaintiff. Defendant counterclaimed for said sum herein on July 9, 1971.

### Stipulation of facts

31. During the tax year in question, in accord with past practices plaintiff dispensed Honorary Doctor of Divinity certificates upon mail order request. Included was a twelve, later a ten, lesson packet which was mailed out for a suggested free will offering of $20.00. Those who could not afford $20.00 were provided with the lessons and certificates free. A flyer was disseminated indicating plaintiff had set up this twelve lesson plan.

> "If you receive these twelve lessons, one a week for twelve weeks, at the end of twelve weeks you will receive from the church an honorary doctor of divinity degree."

In actual practice, the lessons and the Honorary Doctor of Divinity certificate were dispensed simultaneously.

32. Plaintiff has stated these lesson plans are a basic, simple course of instruction in the principles of the church. No prior knowledge of the background of recipients was required. Issuance of the Honorary Doctor of Divinity certificate was based upon a good faith completion of the lesson plans. No testing or other verification was required.

33. Plaintiff ordained anyone for life gratis (upon request). Free will offerings were given but were never required as a condition of the issuance of ministers' credentials.

34. Request for ministers' credentials were largely mail order requests. Ministers' credentials were distributed by mail, at college rallies, and at other public meetings. For example, at one rally 3,000 were distributed.

35. Church charters were granted upon request, largely by mail.

### CONCLUSIONS OF LAW

 From its Findings of Fact, the Court concludes, as a matter of law, that the plaintiff should prevail. Certainly, one seeking a tax exemption has the burden of establishing his right to a tax-exempt status. An organization qualifies for an exemption under 26 U.S.C. Sec. 501(c)(3) only if it is "organized and operated exclusively for religious . . . purposes. * * *" In the defendant's Memorandum in Support of its Requested Instructions, filed February 28, 1973, "the Government admits that the plaintiff passes the 'organizational' test." The above Memorandum and the Stipulation of Facts filed September 18, 1973, further reveal that the defendant's only opposition to plaintiff's claim consists of two conclusions:

(1) That the issuance of Honorary Doctor of Divinity certificates by plaintiff is in opposition to public policy as expressed in the California Education Code; and

(2) That the ordination of ministers, the granting of church charters, and the issuance of Honorary Doctor of Divinity certificates by plaintiff are substantial activities which do not further any religious purpose.

The Court does not accept these conclusions. California Education Code Section 29007 specifically proscribes the issuance of either "academic" or "honorary" degrees and titles which signify, purport or are generally taken to signify satisfactory completion of the requirements of an academic, educational, or professional program of study beyond the secondary school level without proper accreditation or financial requirements. The statute is silent as to rec-

ognized honorary titles conferred for some meritorious recognition.

Expert opinion evidence established that an Honorary Doctor of Divinity is a strictly religious title with no academic standing. Such titles may be issued by bona fide churches and religious denominations, such as plaintiff, so long as their issuance is limited to a course of instruction in the principles of the church or religious denomination.

The Court's conclusion that the issuance of Honorary Doctor of Divinity certificates is not violative of the California Education Code and therefore public policy is supported by a reading of Section 20920, California Education Code:

> "The provisions of Sections 29003 to 29010, inclusive, do not apply to any diploma or course of instruction given by a bona fide church or religious denomination if such course is limited to instruction in the principles of that church or denomination . . .."

█ The Court must then address itself to the defendant's second conclusion: that the ordination of ministers, the granting of church charters, and the issuance of Honorary Doctor of Divinity certificates by plaintiff are substantial activities which do not further any religious purpose. Certainly the ordination of ministers and the chartering of churches are accepted activities of religious organizations. The defendant impliedly admits the same on page 5 of its Memorandum in Support of its Requested Instructions. The fact that the plaintiff distributed ministers' credentials and Honorary Doctor of Divinity certificates is of no moment. Such activity may be analogized to mass conversions at a typical revival or religious crusade. Neither this Court, nor any branch of this Government, will consider the merits or fallacies of a religion. Nor will the Court compare the beliefs, dogmas, and practices of a newly organized religion with those of an older, more established religion. Nor will the Court praise or condemn a religion, how-ever excellent or fanatical or preposterous it may seem. Were the Court to do so, it would impinge upon the guarantees of the First Amendment.

In short, the Court merely finds that the plaintiff's ordination of ministers, its granting of church charters, and its issuance of Honorary Doctor of Divinity certificates are not substantial activities which do not further any religious purpose. Furthermore, the facts outlined *supra* reveal that the plaintiff requested, but did not require, free will offerings in performance of these activities.

It is therefore ordered that the plaintiff be and is entitled to a Federal Tax exemption and to a refund of all monies levied against by the defendant with interest thereon from the date of levy, March 19, 1970.

It is further ordered that defendant's counterclaim be and is dismissed and the plaintiff is entitled to recover the reasonable costs of the suit herein.

It is also ordered that the plaintiff submit an appropriate judgment in accordance herewith.

Done and dated this 27th day of February, 1974.