JULIAN H. BRASWELL AND ANNE S. BRASWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Braswell v. Commissioner
Docket No. 22024-90
United States Tax Court
T.C. Memo 1993-413; 1993 Tax Ct. Memo LEXIS 425; 66 T.C.M. (CCH) 627; September 8, 1993, Filed *425 Decision will be entered for respondent. For petitioners: Sidney A. Soltz and Richard B. Wallace. For respondent: William B. McCarthy and Alison W. Lehr. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: By statutory notice of deficiency, dated July 20, 1990, respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(b)
1979
$ 14,676.00
$  7,934.00
1980
16,743.00
10,375.50
1981
17,271.00
8,635.50
During each year at issue, petitioners contributed substantial sums of money to a chapter of the Universal Life Church (ULC) located in petitioners' home and claimed charitable deductions for the amounts contributed. Respondent disallowed these deductions and, based in large part on these disallowances, determined the deficiencies and additions to tax involved herein. Petitioners concede all tax deficiencies. However, since more than 3 years elapsed between the date petitioners filed their returns and the date respondent mailed a notice of deficiency, assessment and collection of the deficiencies and additions to tax are time barred unless respondent can *426 prove fraud. After concessions by petitioners, the issues for decision are: 1. Whether the conviction of petitioner husband under section 7206(1) for 1981 collaterally estops petitioners from contesting the section 6653(b) addition to tax for fraud. We hold that it does not. 2. Whether petitioners are liable for the section 6653(b) additions to tax for fraud for 1979, 1980, and 1981. We hold that they are. 3. Whether the section 6501 statute of limitations bars respondent from assessing and collecting petitioners' alleged deficiencies and additions to tax for 1979, 1980, and 1981. We hold that it does not. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Julian H. Braswell and Anne S. Braswell, husband and wife, resided in Miami, Florida, at the time their petition was filed. They filed joint Federal income tax returns for 1979, 1980, and *427 1981, on which they claimed charitable deductions in the respective amounts of $ 41,513, $ 52,270, and $ 55,174. The main source of petitioners' income during the years at issue was the salary Mr. Braswell received as a pilot for PanAmerican Airlines (Pan Am). He held the position of captain at Pan Am from 1967 until his retirement in 1981. Mr. Braswell received a salary of $ 94,754 for 1979, $ 97,369 for 1980, and $ 66,142 for the first 4 months of 1981. In 1987, 6 years after Mr. Braswell had retired from active service with the company, Pan Am hired him back as a part-time consultant. Prior to World War II, Mr. Braswell attended college for 3 years. In 1942, he left school to join the United States Army Air Corps. He was honorably discharged from the Corps in 1946, having attained the rank of captain. In 1953, Mr. Braswell received a bachelor of laws degree from the University of Miami. As part of his coursework, Mr. Braswell took a one-credit-hour course in Federal income taxation and received, on a scale of A to F, the grade of B. He was a licensed attorney in Florida from 1954 until 1989, when he gave up his law license. His practice of law was on a part-time basis *428 and consisted primarily of real estate transactions. In the 1940s, Mrs. Braswell took some college courses but did not complete a degree program. Because Mr. Braswell was frequently away from home due to his flight schedule, Mrs. Braswell was primarily responsible for caring for petitioners' four children, managing the household, and paying the mortgage, utilities, grocery, and other household bills. During the years at issue, petitioners owned rental property (which Mrs. Braswell managed), municipal bonds, precious metals, common stocks, commodities, oil and gas properties, various subchapter C and subchapter S corporations, and a horse farm. As a child, Mr. Braswell regularly attended services at a Baptist church where his father was a deacon. Mrs. Braswell has been a member of the Church of Christ since she was 14 years old. During the years at issue, she frequently attended services at the Sunset Church of Christ in South Miami. Petitioners first learned of the Universal Life Church while watching a segment of the popular television program "60 Minutes". The program, which was televised in the fall of 1976, included coverage of the founder of the Universal Life Church, *429 Kirby J. Hensley (Hensley) of Modesto, California; Hensley's controversial practice of appointing ULC ministers through the mail for a "donation" of approximately $ 20; and the ULC's ongoing disputes with the Internal Revenue Service (IRS). The Universal Life Church in Modesto, California (ULC Modesto), is the headquarters for a nationwide network of satellite ULC chapters which numbered up to 5 million in 1976. ULC Modesto is known among ULC members as the "mother church" since it is the founding chapter of the ULC. After watching the "60 Minutes" program on the ULC, Mr. Braswell received a two-page flyer encouraging him to become a ULC minister. The flyer, which was sent by a fellow Pan Am pilot, Ed Mobley (who had formed his own ULC chapter and who had been appointed a ULC minister), was entitled "$ 25,000.00 -- $ 40,000.00 TAX DEDUCTION". The flyer stated in pertinent part: The Universal Life Church, Inc. is recruiting ministers to establish and shepherd congregations of the Mother Church world wide. Contrary to what you may have heard * * * even from your own tax man * * * the ULC is not dead. It is not even in trouble with the IRS! (See the "TIME" article "Sect Manual" *430 reprinted on the other side.) The ULC is not a tax dodge as some would have you believe, but is an outward, positive expression of religious faith as conceived by you personally. The ULC is compatible with; and you are encouraged, not to abandon any other religious affiliation. By now, you are either interested or repulsed by the idea of operating your own tax-exempt church congregation. If repulsed, read no further and please accept my apologies if I have offended you. The ULC makes no moral judgement on any mans' [sic] religion and requests the same consideration. There are very attractive tax advantages in being a ULC minister, but that is not why we exist. Our purpose is to spread our very simple doctrine: "We believe only in what is right, and that all people have the right to determine what beliefs are right for them as long as they do not interfere with the rights of others." Find out why the Berlin Base is undergoing a religious awakening. It's practically impossible to take a flight in the IGS that isn't crewed by an ULC minister. For more information on how to establish your own church, send your Tax Deductible donation of $ 5.00 for the illustrated booklet *431 "A New Dimension in Living" to: Bishop E.L. Mobley, D.D. * * * Please make all checks payable to the Universal Life Church
After receiving the flyer, Mr. Braswell talked to Mr. Mobley about the potential tax advantages of forming his own chapter of the ULC. Mr. Braswell read an IRS determination letter, dated April 13, 1976, addressed to ULC Modesto which states that ULC Modesto "is recognized as exempt under section 501(c)(3) of the Internal Revenue Code of 1954" and, as long as ULC Modesto's operations remain the same, donors may deduct contributions to ULC Modesto as provided in section 170. In addition, Mr. Braswell read a legal opinion that was cited in the IRS determination letter, Universal Life Church, Inc. v. United States, 372 F. Supp. 770 (E.D. Cal. 1974). The opinion held that two practices of ULC Modesto, including its practice of ordaining anyone as a ULC minister for a nominal fee, did not disqualify it from acquiring, for the taxable year 1969, tax-exempt status within the meaning of section 501(c)(3). The IRS determination letter and the District Court's opinion did not discuss activities of satellite ULC chapters. *432 Without searching for any other cases or publications dealing with the tax consequences of forming their own ULC chapter or further inquiring into ULC's proclaimed beliefs and doctrine, in 1979, petitioners sent ULC Modesto $ 20 for a charter and instructions on how to organize their own ULC congregation. In July 1979, petitioners formed the "Heath-Kirk Congregation of the Universal Life Church" (Heath-Kirk chapter). The Heath-Kirk chapter was quite small; the members included petitioners and petitioners' daughter, Julia Braswell. At trial, Mr. Braswell was not sure who the other members were but testified they were "probably Roger and Joan Caron and Glenn Parks". Both Roger Caron and Glenn Parks were ULC ministers, Pan Am pilots, and friends of petitioners. Mr. Braswell did not receive any special religious training to become a ULC minister. He was not interviewed by anyone from ULC Modesto, nor was he given a qualification test. Nonetheless, ULC Modesto appointed him and sent him a certificate, signed by Hensley, stating that Mr. Braswell had been ordained as a minister of the ULC. Mr. Braswell never contacted State or local authorities to ascertain the scope of his authority *433 under State or local law as a minister of the Universal Life Church. The Heath-Kirk chapter never held religious services. After the formation of the Heath-Kirk chapter, Mrs. Braswell continued to attend, and donate money to, the Sunset Church of Christ in South Miami. Petitioners also sent $ 2 per month to ULC Modesto in payment for their dues as a chapter of the ULC. Along with the ULC minister certificate, ULC Modesto sent petitioners a document entitled "Universal Life Church Operations Manual". This document contains various instructions with respect to chartering a church, using a personal residence as a church building, deducting certain expenses of the individual's home as church related, and deducting payments to the minister or for the minister's benefit as salary or related expenses. The manual contains instructions on how to set up a system of records and receipts for a minister's home mortgage and utility payments, his home furniture and fixture expenses, and his family's travel and automobile allowances. The manual also contains instructions about memberships and meetings of the board of directors. Petitioners regularly utilized two accountants for the preparation *434 of their individual and other tax returns; however, petitioners did not consult with the accountants or any other professional tax advisers about forming their own ULC chapter. For 1979, 1980, and 1981, IRS Publication 78, "Cumulative List of Organizations Described in Section 170(c)", lists ULC Modesto as a qualified organization, entitling donors to make tax-deductible contributions to it. [1] But ULC Modesto did not have a group or "umbrella" exemption, meaning that related or subordinate organizations, such as the Heath-Kirk chapter, were not entitled to an exemption by virtue of ULC Modesto's exemption. The Heath-Kirk chapter of the ULC is not, has never been, and has never applied to be, a qualified exempt organization under section 501(c)(3). *435 In July 1979, petitioners opened a bank account at First National Bank of South Miami in the name "the Heath-Kirk Congregation of the Universal Life Church, Inc." (Heath-Kirk account). Petitioners were the only authorized signatories, and expenditures from the Heath-Kirk account were controlled solely by petitioners. The charitable deductions that petitioners claimed for their "contributions" to the Heath-Kirk chapter consisted of funds transferred from petitioners' personal bank accounts to the Heath-Kirk account. During 1979, 1980, and 1981, petitioners drew money out of the Heath-Kirk account each month to make mortgage payments on their residence. These mortgage payments totaled $ 2,635 in 1979, $ 5,797 in 1980, and $ 7,413 in 1981. Prior to making each mortgage payment, petitioners would deposit sufficient funds into the Heath-Kirk account to cover the mortgage payment. Petitioners then claimed that these deposits were charitable contributions and hence eligible for the charitable contribution deduction. Prior to the formation of the Heath-Kirk chapter, and subsequent to its dissolution, petitioners made all mortgage payments from checks drawn on their personal bank accounts. *436 After the formation of the Heath-Kirk chapter, petitioners continued to personally pay property taxes on their residence. Similarly, during the relevant years, petitioners regularly drew checks on the Heath-Kirk account to pay their residential telephone and electric bills. Prior to the formation of the Heath-Kirk chapter, and subsequent to its dissolution, petitioners made these payments from their personal bank accounts. Petitioners never transferred the title of their residence to the Heath-Kirk chapter. And, there is no dispute that the structure in which the Heath-Kirk chapter was located (i.e., petitioners' house) was zoned for residential use, not church use, during the years at issue. In 1979, petitioners drew at least $ 1,900 out of the Heath-Kirk account to pay for new carpeting, draperies, window blinds, and bedspreads for their residence. According to the sales invoices, the items were sold to an "exempt church", the "Heath-Kirk Congregation of the Universal Life Church, Inc.". In December 1979, petitioners authorized the withdrawal of $ 14,582 from the Heath-Kirk account in order to purchase U.S. Treasury bills in the name of the Heath-Kirk chapter. Neither the *437 Heath-Kirk chapter nor petitioners reported the interest income generated by the Treasury bills. Petitioners claim that during the relevant taxable years they believed that the Heath-Kirk chapter qualified as an exempt church under Federal law and that it therefore was not required to report the interest as income. In 1980, petitioners drew two checks on the Heath-Kirk account totaling $ 15,080 for the purchase of precious metals including silver bars, silver coins, and gold coins. Petitioners claim the purchases were an investment for the benefit of the Heath-Kirk chapter. Each of the two check stubs bears the notation "Purchase of Church Stores". In February 1981, Mr. Braswell drew a check on the Heath-Kirk account for $ 7,927 to pay the balance owed and the sales tax on a 1979 Cadillac that petitioners were leasing. Petitioners used the car for personal purposes. The Heath-Kirk chapter also used funds transferred to the Heath-Kirk account from petitioners' personal bank accounts to purchase a motor boat, a 13-foot Boston Whaler. As with the Cadillac, petitioners used the boat for personal purposes. In 1980 and 1981, petitioners drew four checks on the Heath-Kirk account *438 totaling $ 5,491 to pay the college tuition of the son of their friends, Mr. and Mrs. Roger Caron. In return for the payments, the Carons deposited funds into the Heath-Kirk account in like amounts, purportedly as charitable contributions to the Heath-Kirk chapter. Similarly, in 1981, petitioners drew a check for $ 3,804 on the Heath-Kirk account to pay the tuition of Patricia Ecker, the daughter of some other friends of petitioners. The Eckers, in turn, deposited a comparable amount into the Heath-Kirk account in 1981 as a purported charitable contribution. In September 1981, Mr. Braswell drew a check on the Heath-Kirk account for $ 102.95 for the purchase of a tennis racket. The check stub bears the notation "phys. therapy for minister". During 1979, 1980, and 1981, petitioners transferred approximately $ 28,600 from the Heath-Kirk account to their son, Thomas R. Braswell, to assist him in the operation of his restaurant in Atlanta, Georgia. Petitioners claim that the funds represent loans and that the loans were secured by interest-bearing notes. However, at trial, Mr. Braswell admitted that the purported loans had not been repaid and that his son had filed for bankruptcy. *439 Moreover, petitioners did not produce the purported notes to prove that the money was not given to their son outright. During the years 1979 through 1981, Mr. Braswell was on the board of directors of another ULC satellite chapter, the "Lake Harmony Congregation of the Universal Life Church" (Lake Harmony chapter), located in Elysburg, Pennsylvania. As a director, Mr. Braswell approved expenditures of the Lake Harmony chapter which injured to the personal benefit of the chapter's founder and pastor or his family. For the taxable years 1979, 1980, and 1981, petitioners utilized one accountant, James Rush, to prepare their individual Federal income tax returns, and a different accountant, James Pfeiffer, to prepare the Federal income tax returns for their businesses -- Braswell Thoroughbred Farms, Inc., Gables Motor Inn, Inc., and the Braswell/Caron partnership. Mr. Pfeiffer prepared petitioners' corporations' and partnership's returns from worksheets furnished by Mr. Braswell. These worksheets summarized each entity's taxable transactions, including its income, expenses, and beginning and ending cash balances. Mr. Braswell prepared these worksheets on his own, without the benefit *440 of any checklist supplied by Mr. Pfeiffer or Mr. Rush. Although Mr. Pfeiffer knew that Mr. Braswell had been appointed a minister of a ULC chapter, he was unaware of the financial operations of the chapter. At one point, he supplied Mr. Braswell with two single-page forms respectively entitled "Resolution for Senior Pastor Who Resides in His Own Home" and "Resolution for Associate Pastor Who Resides in a Church Owned Residence". The forms, which Mr. Pfeiffer had obtained from his own Lutheran church, were designed to be signed by a church council in approving a pastor's salary and housing allowance. Mr. Braswell apparently never executed the forms and did not return them to Mr. Pfeiffer. Mr. Pfeiffer never gave petitioners any specific advice regarding their individual income tax returns. James A. Rush prepared petitioners' individual income tax returns for the years at issue. Mr. Rush was deceased by the time of petitioners' trial. However, in an affidavit, dated August 10, 1983, Mr. Rush stated the following: I never asked BRASWELL about contributions to the UNIVERSAL LIFE CHURCH nor did I ask BRASWELL about the church itself. I believe that BRASWELL began deducting *441 contributions to UNIVERSAL LIFE CHURCH in 1978 or 1979, but I never saw any cancelled checks to or any receipts from UNIVERSAL LIFE CHURCH. I only saw the worksheet given to me by BRASWELL which showed contributions for 1979, 1980, and 1981. * * * BRASWELL mentioned to me that he was minister of the UNIVERSAL LIFE CHURCH but he never talked about the UNIVERSAL LIFE CHURCH concerning contributions.
In February 1981, petitioners ordered audio tapes from ULC Modesto entitled "I.R.S. lawsuits". As previously stated, petitioners claimed charitable deductions of $ 41,513 for 1979, $ 52,270 for 1980, and $ 55,174 for 1981. In the deficiency notice, respondent disallowed $ 39,849 of the $ 41,513 claimed as a charitable deduction for 1979; $ 36,264 of the $ 52,270 claimed as a charitable deduction for 1980; and $ 50,488 of the $ 55,174 claimed as a charitable deduction for 1981. Respondent also determined additions to tax for fraud under section 6653(b) for each of the years at issue. As a result of an IRS investigation, Mr. Braswell was charged with conspiracy to defraud the United States in connection with his involvement as a board member of the Lake Harmony chapter, pursuant *442 to 18 U.S.C. section 371 (1988). In addition, he was charged with violating section 7206(1) with respect to the joint Federal income tax returns filed by Mr. and Mrs. Braswell over several years including, but not limited to, the taxable year 1981. In October 1986, Mr. Braswell pled guilty and was convicted in the United States District Court for the Middle District of Pennsylvania of one count of conspiracy. Mr. Braswell also pled guilty and was convicted by the District Court of one count of subscribing a false income tax return for 1981 in violation of section 7206(1). For these two offenses, Mr. Braswell was sentenced to 2 years in prison. After serving 54 days, he was released. OPINION Estoppel From Contesting Additions to Tax For Fraud
The first issue for decision is whether the circumstances of Mr. Braswell's conviction under section 7206(1) for 1981 estop petitioners from denying that any part of their 1981 underpayment was due to fraud. Respondent has the burden of proving, by clear and convincing evidence, that (1) petitioners have an underpayment of tax, and (2) that "any part of any underpayment * * * is due to fraud". *443 Secs. 6653(b), 7454(a); Rule 142(b). The courts have consistently interpreted the "due to fraud" language to require proof that a taxpayer possessed the specific intent to evade a tax that he believed that he owed. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). Section 7206(1) makes it a crime for one to willfully make and submit any return, verified by a written declaration that it is made under the penalties of perjury, which he "does not believe to be true and correct as to every material matter". It is well established that a conviction under section 7206(1), in and of itself, does not estop a taxpayer from contesting an addition to tax under section 6653(b) because the specific intent "to evade a tax believed to be owing" required by section 6653(b) is not an element of the crime described in section 7206(1). Wright v. Commissioner, 84 T.C. 636 (1985). Respondent concedes that Mr. Braswell's conviction under section 7206(1) does not invoke collateral estoppel per se, *444 but nonetheless argues that Mr. Braswell's conviction amounts to a prima facie showing of "intent to evade a tax believed to be owing" because, with respect to petitioners' 1981 return, "the falsity involves overstated deductions". Since petitioners have admitted that there is an underpayment of tax for 1981, respondent maintains that the two elements for imposing an addition to tax under section 6653(b) are satisfied. Respondent's reasoning on this issue echoes the rationale of the dissenting opinion in Wright v. Commissioner, supra at 644, which was rejected by the majority of this Court. Although we have considered Mr. Braswell's guilty plea and conviction under section 7206(1) as evidence in this case, we hold that petitioners are not estopped from denying the 1981 section 6653(b) addition to tax for fraud. Additions to Tax For Fraud
The second issue before us is whether, under section 6653(b), petitioners are liable for the additions to their 1979, 1980, and 1981 income taxes due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Section 6653(b) provides an addition *445 to tax equal to 50 percent of the underpayment if any part of the underpayment is due to fraud. An underpayment of tax is due to fraud if it results from a taxpayer's specific intent to evade a tax which the taxpayer believes that he owes. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Thus, in order to prove that an underpayment is due to fraud, the Commissioner must show that the taxpayer intended to evade a tax known to be due by engaging in conduct designed to conceal, mislead, or otherwise prevent the collection of such tax by the Commissioner. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). The existence of fraudulent intent is a factual question to be decided on the basis of an examination of the entire record. Recklitis v. Commissioner, supra at 909; Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). It may never be presumed but *446 must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Because direct proof of a taxpayer's intent is rarely available, however, fraud may be established by circumstantial evidence. Grosshandler v. Commissioner, supra at 19; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). In this case, there are clear indications that petitioners' underpayment of tax for each of the years at issue is due to fraud with the intent to evade tax. At the time petitioners claimed the charitable deductions on their returns, the law was already well established that such deductions were permissible only if the transfer did not result in the receipt of economic benefits to the donor. Yet petitioners utilized the funds "donated" to their Heath-Kirk chapter to pay the mortgage and utilities on their personal residence. Also, with "donated funds", petitioners "loaned" $ 17,500 to their son and purchased Treasury bills and precious metals (falsely labeled as "church stores"), as well *447 as a boat, a car, draperies and rugs, and a tennis racket (labeled physical therapy for minister). It is apparent that petitioners' mislabeling of these items was designed to conceal their personal nature. Petitioners contend that in 1979, 1980, and 1981, they believed that they could follow the instructions from ULC Modesto and deduct any amounts that they deposited into the Heath-Kirk account even though they maintained full control over the account and spent the funds exclusively for their own benefit. Petitioners claim that when they saw the exemption letter issued to ULC Modesto by the IRS (now revoked) and the operations manual published by the ULC Modesto, they thought they had found some kind of legal loophole through which they could legally avoid paying taxes on their income. These claims are not worthy of belief. We have considered petitioners' testimony as well as the other evidence of record. We conclude that both petitioners knew that they were not entitled to the claimed deductions for charitable contributions to the ULC, but that they took those deductions in each year with the intent to evade tax. We reach our conclusion as follows. First, during 1979, 1980, *448 and 1981, Mr. Braswell was a practicing attorney who, according to his own testimony, advised clients on their real estate transactions and, presumably, the tax consequences of those transactions. The record shows that both Mr. and Mrs. Braswell [2] were savvy investors who built a six-unit apartment house, formed several small businesses including a thoroughbred horse corporation, and purchased five duplexes and numerous interests in stocks, bonds, and commodities. Certainly, both petitioners possessed the business acumen sufficient to have realized that they could not legally deduct the large amounts over which they maintained complete control and which they utilized to pay for most of their personal living expenses. *449 Secondly, petitioners knew at the outset [3] that ULC Modesto and its satellite chapters were controversial and employed questionable tax practices. Petitioners were alerted to the questionable legitimacy and tax practices when they saw the "60 Minutes" program and read the recruiting flyer distributed by Ed Mobley which stated that "contrary to what you may have heard * * * even from your own tax man * * * the ULC is not a tax dodge". Although petitioners had plenty of reasons to question the legitimacy of the ULC tax scheme, they did not consult an attorney (other than Mr. Braswell himself), tax accountant, or financial adviser as to the legality of the deductions. The fact that petitioners, who were both raised in the Protestant faith, did not make a genuine effort to research the proclaimed religious beliefs of the ULC is further evidence that they were only interested in forming the Heath-Kirk chapter so that they could make spurious charitable contributions to the chapter and thereby understate their income and reduce their tax liability. *450 Petitioners also did not fully inform their tax return preparer, Mr. Rush, about the Heath-Kirk account over which they maintained complete control, but merely gave him figures that petitioners prepared on a summary worksheet. Petitioners thus clearly led Mr. Rush to believe that they were donating a large percentage of their income to a legitimate church rather than laundering the funds through the Heath-Kirk account and spending the amounts entirely for their own personal benefit. Finally, petitioners knew that they could not deduct an amount as a charitable contribution and deduct the same amount as an interest deduction or home office deduction. Nonetheless, petitioners took double deductions in each of the relevant taxable years. Thus, we conclude that petitioners' underpayment of tax in each of the relevant taxable years was due to fraud with the intent to evade tax. We therefore sustain respondent's determinations of the additions to tax for fraud under section 6653(b) for 1979, 1980, and 1981. Statute of Limitations With Respect to Additions to Tax for 1979, 1980, and 1981
Petitioners argue that the statute of limitations imposed by section 6501 bars respondent *451 from assessing or collecting the deficiencies and additions to tax determined by respondent. Section 6501(a) provides, generally, for a 3-year period of limitations. Section 6501(c), however, creates an exception to the general rule, extending the period of limitations indefinitely in the case of a fraudulent return. We have found that petitioners are liable for the additions to tax for fraud for 1979, 1980, and 1981. Therefore petitioners' argument falls by the wayside. We hold that the statute of limitations imposed by section 6501(a) does not preclude respondent from assessing the deficiencies and additions to tax otherwise due. Decision will be entered for respondent. Footnotes
1. Publication 78, "Cumulative List of Organizations described in Section 170(c)", contains a list of organizations with outstanding rulings or determination letters holding that contributions to these organizations are deductible. The list is not all-inclusive. If an organization is not listed but has received a determination letter from the IRS, contributors are generally permitted to deduct their donations. However, if an organization has not received such a letter, contributors are not permitted to deduct their donations, unless it is an organization described in sec. 170(c)(1); i.e., a State, a possession of the United States, or any political subdivision of the foregoing, or the United States or the District of Columbia.↩
2. Petitioners stipulated that Mrs. Braswell is not entitled to relief as an innocent spouse under sec. 6013(e). Regardless of petitioners' concession, based on Mrs. Braswell's conduct, her business experience, and her apparent motive in forming the Heath-Kirk chapter with her husband, we find Mrs. Braswell just as culpable as Mr. Braswell.↩
3. At least by Jan. 28, 1980, cases of this Court had held that deductions, comparable to the ones claimed by petitioners with respect to so-called chapters of the Universal Life Church, were not allowable. See Abney v. Commissioner, T.C. Memo. 1980-27↩.