TERRY W. ANDREWS AND BONNIE J. ANDREWS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Andrews v. Commissioner
Docket No. 25412-92
United States Tax Court
T.C. Memo 1994-615; 1994 Tax Ct. Memo LEXIS 622; 68 T.C.M. (CCH) 1441; December 19, 1994, Filed *622 Decision will be entered under Rule 155. Terry W. and Bonnie J. Andrews, pro se. For respondent: Thomas M. Rohall. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
1980
$ 2,433
$ 1,217
1981
5,097
2,549
After concessions, [1] the issues for decision are: (1) Whether petitioner is liable for additions to tax for fraud under section 6653(b)[2] for the taxable years 1980 and 1981; and (2) if not, whether the period of limitations expired prior to the issuance of the notice of deficiency. *623 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Martinez, California, at the time they filed their petition. Petitioners timely filed their joint Federal income tax returns for the 1980 and 1981 taxable years, which were prepared by petitioner. During 1980 and 1981, petitioner was employed as a probation officer by the Contra Costa County Probation Department. In 1979, petitioner graduated from San Francisco Law School and was admitted to the State Bar of California. During the academic year 1978-1979, petitioner successfully completed a course in Federal income tax at San Francisco Law School, receiving a "B" in the course. During 1980 and 1981, petitioner practiced law in addition to his employment as a probation officer. On at least two or three occasions, petitioner prepared Federal income tax forms for a fee. Prior to petitioner's attending law school, he obtained an undergraduate degree from Brigham Young University in psychology. Petitioner also received a graduate degree in public administration from California State University *624 at Hayward. In September 1978, petitioners entered into an agreement with Universal Life Church, Inc. (ULC), which is headquartered in Modesto, California, to form a local ULC congregation. Petitioners named their congregation Alhambra Valley and designated the address of the church as 93 Mackie Drive, Martinez, California 94553, which was the address of petitioners' personal residence. The agreement was signed by petitioner as the pastor of the Alhambra Valley Church, petitioner Bonnie J. Andrews as the treasurer, and Rollie James Nichols as the secretary. Mr. Nichols is petitioner's brother. Although Mr. Nichols was listed as a member of the governing board, he did not participate in the adoption of the church's start-up resolutions; he never authorized payment of any expenses from the church bank account; and he was not listed as a signatory on the church bank account. His presence was not even required at the board meetings; two members constituted a quorum. In September 1978, petitioners opened a bank account at Central Bank, Concord, California, in the name of Universal Life Church (ULC account). Petitioners were the only authorized signatories on the account. Deposits *625 to the ULC account for the years 1980 and 1981 totaled $ 1,800 and $ 1,935, respectively. All the deposits to the ULC account were transfers from petitioners' personal checking account at Bank of America. When they started their congregation, petitioners received literature from ULC in Modesto advising them, among other things, how to set up their congregation, how to recruit new members, and the tax benefits associated with being a church. Specifically, the literature stated that the various congregations were not separate churches but rather were all part of ULC, which was headquartered in Modesto. According to the literature, donations made to individual congregations were tax deductible just as if they were made to ULC in Modesto. [3] Furthermore, the literature stated that a congregation could vote to pay the minister a housing allowance to cover certain housing costs, including mortgage payments, property taxes, insurance, and utilities. Any deductible costs, such as mortgage interest and property taxes, could also be deducted by the minister who owned his own house according to the literature. *626 Petitioner testified that prior to setting up his ULC congregation, he contacted the ULC headquarters and was advised that if he followed the rules and regulations set out in the literature, the tax benefits were perfectly legal. Petitioner also testified that he had read an article in a legal newspaper indicating that many attorneys were operating ULC churches to obtain tax relief. Moreover, petitioner advised others about the tax benefits associated with starting a ULC congregation and told them that if they followed the guidelines provided by ULC, including documenting all expenditures for church activities, they would be able to take tax deductions for contributions to individual ULC congregations. One of the others to whom petitioner gave advice was Mr. Thomas Cunningham. Mr. Cunningham received a letter from his accountant together with an attached publication setting out the Internal Revenue Service's position against the legality of charitable deductions claimed in connection with mail order ministries, such as ULC. As a result, Mr. Cunningham did not claim any ULC deductions on his original 1980 Federal income tax return. Mr. Cunningham discussed the contents of this *627 letter with petitioner sometime around April 1981. Petitioner suggested that Mr. Cunningham file an amended return deducting the alleged contributions. Mr. Cunningham did so and received a refund from the Internal Revenue Service. Petitioners deducted charitable contributions allegedly made to ULC in 1980 and 1981 in the amounts of $ 12,357 and $ 19,060, respectively. However, petitioners did not send any money or other property to ULC in Modesto during the years in issue other than small accounting or record-keeping fees of less than $ 10 per quarter. All the money allegedly donated by petitioners was used to pay for personal expenses, such as mortgage payments, utilities, telephone, and "certain amenities for social functions". In addition to taking deductions for the above charitable contributions, petitioners took itemized deductions for their home mortgage and real estate taxes. Petitioners used an "Annual Receipt of Contributions" issued by ULC in Modesto to substantiate their charitable donations for each of the years in issue. The practice of ULC was to provide uniform receipts to each of the local churches on which to record individual contributions. Each receipt *628 was required to be signed by a third party. These individual receipts were then totaled and sent to ULC in Modesto, who would issue an Annual Receipt of Contributions for that total amount. Mr. James Moriarty signed the individual receipts for Mr. Cunningham and petitioner. Petitioner signed the individual receipts for Mr. Frederick Kozon. Neither petitioner nor Mr. Moriarty verified these receipts at the time they signed them to ensure that contributions were actually made. On June 14, 1982, petitioner was interviewed by two special agents of the Internal Revenue Service in connection with an investigation of Mr. Moriarty. During that interview, petitioner indicated that he was aware that the Internal Revenue Service was questioning donations made to individual congregations, but that he had researched the case law and regulations and had concluded that contributions to the local congregations of the ULC were deductible. Petitioner also indicated that he understood the characteristics of a deductible charitable contribution -- that the deduction would have to be final and the donor would have to give up all rights to the contribution. On August 19, 1985, this Court filed *629 its decision in Conlow v. Commissioner, T.C. Memo. 1985-430. In that case, we held that deductions claimed for charitable contributions to a local ULC congregation were properly disallowed and imposed an addition to tax for negligence under section 6653(a). Petitioner was listed as counsel for Mr. Conlow in that case. On April 8, 1987, petitioner was indicted for willfully making and subscribing false income tax returns for the taxable years 1980 through 1982, pursuant to section 7206(1). On March 7, 1988, petitioner entered a plea of guilty to making and subscribing a false income tax return for the taxable year 1982. At the time petitioner entered his plea of guilty, the judge asked him if he took deductions to which he was not entitled and whether the amount of these deductions was significant. Petitioner answered both questions affirmatively. The remaining charges of the indictment were dismissed. OPINION Respondent has determined that petitioner is liable for additions to tax under section 6653(b) for fraudulently understating his income in 1980 and 1981. Section 6653(b) provides that if any part of any underpayment of tax is due to fraud, *630 there shall be added to the tax an amount equal to 50 percent of the underpayment. In order to establish petitioner's liability for fraud, respondent bears the burden of proving by clear and convincing evidence that: (1) An underpayment exists for each of the years in issue, and (2) that some portion of each underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). First, respondent must prove that an underpayment exists for the years in issue. Respondent cannot rely on petitioner's failure to prove error in respondent's determination to meet her burden of proof. Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Petitioners conceded that the deductions taken on their 1980 and 1981 returns for contributions to the ULC, which resulted in the deficiencies, were properly disallowed. Accordingly, respondent has met her burden of proving that an underpayment exists for the years in issue. Next, respondent *631 must prove that some portion of the underpayment for each year is due to fraud. Respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, supra at 1123. The existence of fraud is a factual question to be determined upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, supra at 106. However, fraud may be proved by circumstantial evidence and reasonable inferences drawn *632 from the facts, because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowleee v. Commissioner, supra at 1123. The taxpayer's level of education and sophistication and the context of the events in question may be considered circumstantial evidence of fraud. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); see also Halle v. Commissioner, 175 F.2d 500, 502 (2d Cir. 1949), affg. 7 T.C. 245 (1946); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Braswell v. Commissioner, T.C. Memo. 1993-413; Utz v. Commissioner, T.C. Memo. 1991-468, affd. without published opinion 988 F.2d 1217 (11th Cir. 1993). In the present case, there are clear indications that petitioner's underpayments for 1980 and 1981 were due to fraud. Petitioner contends that he believed, in good faith, that he could follow *633 the instructions from ULC in Modesto and take the tax deductions as indicated in the literature -- "that the deductions that the Universal Life Church had set up was a tax loophole." However, the facts do not support such a belief. To the contrary, the circumstances indicate that petitioner knew that the claimed donations were not deductible, but that he took the deductions during the years in issue with the intent to evade tax. First, petitioner was clearly well educated. During the years in issue, petitioner was a practicing attorney. He had successfully completed a course in Federal income taxation and had even prepared tax returns for a fee. Furthermore, petitioner had an undergraduate degree in psychology as well as a graduate degree in public administration. Certainly, petitioner possessed a level of tax knowledge and sophistication sufficient to have realized that he could not legally deduct amounts over which he maintained control and that were used to pay for personal living expenses. Second, about April 1981 (the time for filing petitioners' 1980 income tax return), Mr. Cunningham discussed with petitioner the contents of the letter Mr. Cunningham received from his *634 accountant, which advised him of the Internal Revenue Service's position against the propriety of charitable deductions in connection with ministries such as ULC. Thus, at least as early as April 1981, petitioner became aware of the controversial nature of his claimed deductions. Furthermore, petitioner indicated that he had researched the law regarding ULC donations. By the time petitioners filed their 1981 Federal income tax return, the law was well established that payments made to local congregations of ULC were not deductible as charitable donations under section 170(c), because the payments resulted in the receipt of economic benefits by the donor. Solander v. Commissioner, T.C. Memo. 1982-161; Notter v. Commissioner, T.C. Memo. 1982-96; Kellman v. Commissioner, T.C. Memo. 1981-615; Riemers v. Commissioner, T.C. Memo. 1981-456; Self v. Commissioner, T.C. Memo. 1981-232; Brown v. Commissioner, T.C. Memo. 1980-553; Abney v. Commissioner, T.C. Memo. 1980-27. The *635 reasoning in each of the above cases applies equally to the case at bar, and the relevant facts are virtually indistinguishable. Even though petitioner was armed with knowledge that the Internal Revenue Service was questioning ULC deductions and given this Court's repeated denial of such deductions, he did not consult a tax professional as to the legality of the deductions. Third, petitioner decided to form a ULC congregation only after reading in the paper that many attorneys joined ULC as a way of obtaining relief from their taxes. Petitioner emphasized the tax benefits associated with ULC when he advised others how to become involved with the church. Thus, petitioner was simply looking for a scheme by which to avoid tax, which is further evidence of his intent to evade tax. Fourth, petitioners claimed double deductions by deducting mortgage interest and property taxes when the funds used to pay these expenses had already been claimed as charitable deductions. This Court has held that claiming double deductions is evidence of fraud. Braswell v. Commissioner, supra; Utz v. Commissioner,supra.
We conclude *636 that petitioner's underpayment of tax in each of the taxable years in issue was due to fraud. We therefore sustain respondent's determinations of the additions to tax for fraud under section 6653(b) for 1980 and 1981. Section 6501(a) provides that the amount of any tax shall be assessed within 3 years after the return was filed. However, section 6501(a)(1) creates an exception in the case of a fraudulent return, permitting assessment or collection of such tax at any time, without regard to the 3-year period of limitations. Having found that petitioner's underpayments of tax in 1980 and 1981 were due to fraud, the statute of limitations imposed by section 6501(a) does not preclude respondent from determining the deficiencies and additions to tax in this case. Sec. 6501(c)(1). Decision will be entered under Rule 155. Footnotes
1. Petitioners conceded that the deductions taken on their 1980 and 1981 returns for contributions to the Universal Life Church, which resulted in the deficiencies, were properly disallowed. On brief, respondent conceded the deficiency against petitioner Bonnie J. Andrews. Thus, the remaining issues deal only with petitioner Terry W. Andrews, and references to petitioner in the singular refer only to him.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. In Universal Life Church, Inc. v. United States, 372 F. Supp. 770 (E.D. Cal. 1974), the ULC was held to be a tax-exempt organization within the meaning of sec. 501(c)(3). This holding, however, applied only to the parent church in Modesto; it was not a group exemption for all ULC congregations. Woods v. Commissioner, T.C. Memo. 1982-653; Harcourt v. Commissioner, T.C. Memo. 1982-621; Riemers v. Commissioner, T.C. Memo. 1981-456↩.